United States District Court
Southern District of Texas
FILED

JUN 2 2 2015

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

MARIANO ALVAREZ,
     Petitioner,

   -vs-

UNITED STATES OF AMERICA,
     Respondent.

Civil No. **M-15-280**
Crim. No. M-07-144
Judge Crane

MOTION TO VACATE
CONVICTION AND
SENTENCE UNDER 28
USC SECTION 2255

     Now comes Mariano Alvarez (hereinafter "Petitioner"), acting in pro per, and hereby moves to vacate his conviction and sentence under 28 USC Section 2255, which provides:

> "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States...may move the court which imposed the sentence to vacate, set aside or correct the sentence."

     A brief in support of said motion is attached hereto and incorporated herein by reference.

Respectfully submitted,

*Mariano Alvarez*

Mariano Alvarez
Reg. No. 94625-179
Petitioner in pro per
USP Allenwood
P.O. Box 3000
White Deer, PA 17887

<u>BRIEF</u>

On July 28, 2008, Petitioner was charged in a superseding indictment in Count One with engaging with a drug trafficking conspiracy beginning in January of 2005, and continuing until February of 2007, with co-defendants Eden Flores, Sr., Isauro Casas, Anwar DeLuna, Eduardo Guerra, Guadalupe Hernandez, and Abraham Hernandez, in violation of 21 USC Sections 841(a), 841(b)(1)(A), and 846. (R. 55). [1/] In Count Two, Petitioner was charged with a money laundering conspiracy, during the same time period, with Eden Florez, Sr., Isauro Casas, Jose Luis Villarreal, and Felix Alvarez, in violation of 18 USC Sections 1956(a)(1)(A)(I) and 2.  <u>Id</u>.   In addition to the conspiracies alleged, Petitioner was charged substantively as follows:

Count Three:  April 21, 2005, money laundering by delivery of $279,995 in drug proceeds, in violation of 18 USC Sections 1956(a)(1)(A)(I) and 2.

Count Five:  January 13, 2006, money laundering by delivery of $2 million in drug proceeds, in violation of 18 USC Sections 1956(a)(1)(A)(I) and 2.

Count Six:  February 21, 2006, possession of 217 kilos of cocaine with intent to distribute, in violation of 18 USC Section 841(a)(1) and 841(b)(1)(A), and 18 USC Section 2.

Count Seven:  May 13, 2006, money laundering by delivery of $35,000 in drug proceeds, in violation of 18 USC Sections 1956(a)(1)(A)(I) and 2.

---

[1/] "R" stands for record.  Also, because there were two trials in this case, Petitioner will cite to the trial, the day of the trial, and the page as, <u>e.g.</u>—for the first trial, (1 T.R., 1st day, p.); for the second trial, (2 T.R., 1st Day, P.).

Count Eight:   July 13, 2006, money laundering by
               delivery of $413,000 in drug proceeds,
               in violation of 18 USC Sections 1956(a)(1)(A)(I)
               and 2.

Id.

Petitioner pleaded not guilty to the charges, and his
trial commenced on November 5, 2008, (1 T.R., Voir Dire, 3),
before this Court in McAllen, Texas.  Petitioner's trial concluded
on December 8, 2008, when this Court declared a mistrial.  (1 T.R.,
19th Day, 8.)  Sua sponte, this Court transferred the case to
the Houston Division for retrial.  Id.  The second trial began
on July 6, 2009, (2 Voir Dire, 4), and concluded on July 21,
2009, when the jury found Petitioner guilty of Counts One, Two,
Three, Five and Six, and not guilty of Counts Seven and Eight.
(R. 711).

On December 2, 2009, this Court sentenced Petitioner on
Counts One and Six to concurrent terms of life imprisonment.
(R. 729).  This Court also sentenced Petitioner on Counts Two,
Three, and Five to concurrent terms of twenty years confinement.
Id.  Petitioner was additionally ordered to pay $500 in
mandatory assessments in aid of crime victims, pursuant to
18 USC Section 3013. Petitioner appealed his conviction and on
April 8, 2014 his conviction was affirmed.  (Exhibit A).
Petitioner did not move for certiorari.

The facts of this case are as follows:  Eden Flores, Sr.,
and Petitioner were friends.  (2 T.R., 1st Day, 239).  Eden
Flores owned several businesses in Mission, Texas—The La Tejana

3

Steakhouse, La Tejana Meat Market No. 1, and La Tejana Meat Market No. 2. Id., 214-215. (2 T.R., Day 2, 313). Petitioner and Flores frequently socialized, and would often have lunch together at Flores's steakhouse. (2 T.R., 1st Day, 194). Flores also owned a residence in Mission, Texas, which he leased to Isauro Casas. (2 T.R., 4th Day, 25-6). Casas worked for Mr. Flores at one of the meat markets. (2 T.R., 6th Day, 154).

Petitioner owned a working ranch in Rio Grande City, on Alvarez Road, which had been in the family for generarations. (2 T.R., 1st Day, 223). Petitioner also owned a construction company, and was a hands-on worker on both the ranch and on construction jobs. Id. 223-225, 225, 266, 281. The construction company was a legitimate business, and the work was steady— operating Mondays through Saturdays. Id., 226, 266. As part of his construction business, Petitioner had hundreds of thousands of dollars in equipment, and sold heavy equipment in San Antonio. Id., 279-80.

Victor Garcia—Petitioner's cousin—testified for the government after it dismissed a drug trafficking case pending against him. Id., 244-48, 250-52. In 1989 and 1990, Garcia worked at Petitioner's ranch doing ranch and yard work. Id., 165. At some point, Garcia was paid $100 a night, two to three times a month, to watch bundles of marijuana stored at the ranch. Id., 166, 172-73. In 1995, Garcia went to prison for possession of marihuana unrelated to Petitioner. Id., 174. Garcia was

4

released from prison in 2005, and returned to work at Petitioner's ranch, performing manual labor. Id., 175. Again at a later occasion, Garcia was paid to watch marihuana and cocaine stored on the property. Id., 177.

According to Garcia, Petitioner maintained his records in a planner which he always kept with him, and where he kept track of money spent, payroll, and other expenses. Id., 196, 205, 212. Petitioner used a numeric code system for names, law enforcement agencies, drugs. Id., 196. Petitioner used codes for everything, including legitimate businesses. Id. 196, 239. Garcia was "82", Manuel Acevedo was "21", and Petitioner was "71." The code for local police was "48", the code for DPS was "67", and the code for Border Patrol was "50." Id., 196-98. The code for cocaine was "37", the code for marihuana was "54", and the code for money was "25." Id., 199, 263-64. The code for Wal-Mart was "14." Id., 196. Codes were used in case someone was eavesdropping. Id., 198.

On April 21, 2005, Petitioner, Victor Garcia, and Manuel Acevedo were pulled over for a traffic violation by Freer Police Officer Nicholas Juarez. (2 T.R., 1st Day, 63, 73, 165, 179). Juarez stopped Petitioner for a defective bulb over the license plate. Id., 62, 101, 186. At the stop, Petitioner informed Juarez that he was returning to Rio Grande City after selling a front-end loader and a trailer in San Antonio. Id. Petitioner informed Juarez that they had not spent the night in San Antonio.

5

Id., 71-2.

Juarez noticed that Petitioner was wearing a black utility belt—which was likely uncomfortable during a long drive—and saw luggage inside the vehicle, inconsistent with a day trip. Id., 69-70, 72. These circumstances aroused Juarez's suspicions. Id. Juarez issued Petitioner a warning citation for the traffic violation, then asked for, and received, Petitioner's consent to search the vehicle. Id. at 71-2. At the rear of the truck, Juarez observed pry and dent marks on the spare tire around the rim, and fresh scrapes on the undercarriage. Id., 74. Petitioner explained that he'd had a flat tire earlier in the day, and had lowered the tire to change it. Id. at 75-6. Juarez asked permission to examine the tire, itself, and Petitioner provided him with a tire tool to remove it. Id., 76. A piece of the tire tool was missing, however, and Juarez was unable to lower it. Id. at 78. At Juarez's request, Petitioner followed him to a tire shop. Id., 79. Juarez called a drug Task Force Officer to meet him at the shop, and the tire was examined with a density meter. Id. at 81. Another officer arrived with the correct tool, and the tire was opened. Id., 82, 84. Inside, officers found $279,995 in currency, bundled in cellophane, and vacuum sealed. Id., 130. In an inventory search of the truck, officers recovered two receipts from Dallas dated April 20 and 21, 2005. (2 T.R., 1st Day 92-4, 121; 2 T.R., 2nd Day, 15-7; 35). One was from a Home Depot; the

other was from a Red Lobster restaurant. Id., 93-4, 122-23.

Petitioner was questioned by DPS Lieutenant Ronald Saenz. (2 T.R., 2nd Day, 46). Petitioner informed Saenz that he had sold a backhoe, two flatbed trailers, four dump trucks, a John Deere tractor, and a loader in San Antonio. Id., 46-8. Petitioner put the money from the sales into the tire. Id., 48. Petitioner told Saenz that he didn't care if they took the money. Id., 50.

Victor Garcia testified that he accompanied Petitioner on this trip, first driving a dump truck to San Antonio to deliver to a buyer. (2 T.R., 1st Day, 179). It was Garcia's understanding that they were to pick up money from the sale in San Antonio. Id., 180, 234. The money was not in San Antonio, however, but in Dallas. Id., 180, 235. Garcia, Petitioner, and Acevedo traveled to Dallas from there. Id.

The three ate dinner at a Red Lobster restaurant in Dallas on the night of April 20, 2005. Id., 181. The following day, they picked up the money at a house. Id. The spare tire was removed from Petitioner's truck, the money was placed in the spare, and the spare was put back on the truck. Id., 183. It had been necessary to deflate the tire to put the money inside, and Petitioner purchased an air compressor at a Home Depot to air the tire up so that it would look normal on the vehicle. Id., 182-83. The money was hidden in the tire to avoid getting robbed, and Garcia believed that the money came

from the sale of equipment.  Id., 181, 236.  On the drive back,
Petitioner instructed Garcia and Acevedo to get rid of everything
in the truck pertaining to Dallas in case they were pulled over.
Id., 186.  In addition to disposing of items they had on
them, Acevedo threw out the key to the tire tool so that it
would be harder to remove the spare.  Id., 188.  The three
drove through San Antonio on their way back to Rio Grande City.
Id., 185.

The government offered no direct evidence that the $279,995
was proceeds from drug trafficking.

In January of 2006, Houston DEA was investigating an unknown
drug trafficking cell.  (2 T.R., 2nd Day, 124).  In the
investigation, DEA learned that two million dollars in drug
proceeds were in Atlanta, Georgia, awaiting pickup for transport
to Texas.  Id., 111, 136.  DEA Agent Prentice Coleman had a
confidential source, who put out on the street that he could
transport money safely throughout the United States in armored
cars.  Id.  Coleman and two ICE Agents from Houston traveled
to Atlanta to coordinate the money transfer there.  Id. 137.
In Atlanta, DEA Agent Julio Alba, working undercover, was
introduced to Jose Luis Villareal, called "Canas", as someone
who could transport the money.  Id., 112, 114.  Alba and
Villareal first met at a Waffle House on January 14, 2006; the
following day, Villareal transferred to Alba two duffle bags
containing the currency for transport to Texas.  Id., 113-14, 116.

8

From Atlanta, the currency was flown to Houston in a DEA airplane. Id., 138. There, the money was examined by a canine unit, and the dog positively alerted to the presence of cocaine.[2] Id., 138. From Houston, DEA flew the money to McAllen where it was to be turned back over to Villareal in a vehicle DEA provided. Id., 138-39. According to Coleman, the purpose of the investigation was to follow the money to see where it was going, and to identify the source of supply. Id., 137, 139, 142. In Coleman's view, the money was destined for the source of supply, and would likely be reinvested in the Mexican drug trade. Id., 142, 149.

The currency transfer to Villareal took place on January 18, 2006, at a Logan's Roadhouse Restaurant in Mission, Texas. Id., 152-55. ICE Agent Yolanda Ibarra, working undercover, met Villareal at the restaurant, and provided him with the keys to a white minivan, loaded with the currency. Id., 152-55. Once the money was delivered, Villareal was to return the minivan to the restaurant. Id., 139-40, 153-56. Agents followed Villareal in the minivan to a residence in Mission, Texas, both by air and on the ground. Id., 140. The residence was later

---

[2] According to Georgia Police Sergeant T.K. Gordon, assigned to the drug Task Force, Villarreal was followed in Atlanta to two residences. Id., 125. During subsequent surveillance of these residences, officers observed significant interactions among the people, suggesting drug-related meetings. Id., 126. After Villarreal moved the money from one of the residences, a traffic stop of one of the residents was made, and drugs were seized. Id., 126-127.

identified as the home of Isauro Casas, though Eden Flores
owned the property.  (2 T.R., 4th Day, 169-70).

DEA Agent John Hernandez followed the minivan in a spotter
plane.  Id., 288.  From there, Hernandez saw Villareal get into
the white minivan at the restaurant, then follow a red pickup
truck to the property in Mission, where the money was delivered.
Id., 292-93.  When Villareal entered the property, he was guided
to the back of the residence.  Id., 294.  Hernandez observed
Villareal get out of the minivan, and saw the back of the
minivan opened.  Id.  Villareal went inside the residence.  Id.,
295.  Hernandez observed another vehicle enter the property,
which looked like an Avalanche, and saw an individual get out
of that vehicle and walk to the back where the money was
off-loaded.  Id., 295.  About fifteen minutes later, Villareal
left in the minivan, returned it to Logan's Roadhouse, then got
into the red pickup Hernandez had seen  earlier.  Id., 296-98.
A black Avalanche was parked in the Logan's lot by the time
Villareal returned.  Id. at 298.  Ground surveillance obtained
the plate number, and the Avalanche was registered to Petitioner
and his wife.  Id., 298-99.

Hernandez saw three individuals get out of the red pickup
and walk toward the entrance of a nearby Red Lobster restaurant.
Id., 299.  Two of the individuals went into the restaurant,
while the other walked over to the Avalanche and got into the
passenger seat.  Id.  After a short time, the Avalanche was

10

followed to the La Tejana Steakhouse in Mission, Texas.  Id.,
300-01.  The individual in the Avalanche got out, and entered
the restaurant through the bar.  Id., 301.  Surveillance was
then discontinued.[3/]

Hugo Barrera-Cavazos, and Reynaldo Oyervides, testified
to their involvement in the $2 million currency transportation,
from the Mexican side.  Barrera was partners with Raul
Valladares in a drug cartel, operating out of Monterrey, Mexico,
and importing cocaine directly from Colombia.  (2 T.R., 5th Day,
170).  Barrera estimated that, in the course of this partnership,
they imported over 10,000 pounds of cocaine.  Id., 171.  Beginning
in 2000, up to 2002 or early 2003, Barrera and Valladares worked
directly with YaYa Lopez.  Id., 135.  Lopez controlled the Plaza
in Miguel Aleman, Mexico, and cocaine could not pass into the
United States through the Plaza unless Lopez was paid for
passage.  Id.  According to Barrera, Lopez was Petitioner's
boss.  Id.  An individual identified as "El Tio" also worked
for Lopez, transporting cocaine from Monterrey to the border
for transit into the United States.  Id., 161-62.

In 2002 or early 2003, Lopez was killed in Guadalajara.
Id., 142.  Approximately six months later, Lopez's godson,
Juan Guerra, introduced Barrera to Petitioner at a Red Lobster
restaurant in McAllen.  Id., 142.  It was there agreed that

_____

3/ Governement's Exhibit 35A, Petitioner's planner seized by
law enforcement at the time of his arrest, contained a notation
for June 18th—the day of the controlled delivery—which stated,
"Tejana 20 lunch."  (Id. at 303; T.R., 4th Day, 55).

Petitioner would move drugs from Miguel Aleman to McAllen, for transport on to New York and Atlanta. Id. At some point, Petitioner informed Barrera that El Tio was working for him, bringing cocaine to Petitioner at the border, and taking money from the sales back to Valladares. Id., 163-64. Barrera believed that, in the course of this relationship, Petitioner was provided with 200 kilos of cocaine on six occasions, at a cost to Petitioner of $1,250 per kilo. Id., 143.

Turning to the events in January 2006, Barrera testified that Valladares was in the United States where his daughter was hospitalized. Id., 153. Valladares needed money to pay the hospital bill, and instructed Barrera to arrange for the pickup of drug proceeds in Atlanta. Id. The money was to be dropped off with "El Palone"—the money man in Monterrey—who would pay Valladares 5%. Id., 153-54. Though Valladares wanted the money delivered to Laredo, Barrera wanted to see if Petitioner could receive the money in McAllen. Id., 155, 158. Barrera did not deal with Petitioner directly on this matter; instead Valladares directed Oyervides to make the arrangements. Id., 156, 158-59. According to Barrera, Valladares trusted Jose Luis Villareal to handle the transportation of money. Id., 157. It was Barrera's understanding that the money was delivered. Id., 156, 160.

Reynaldo Oyervides, called "Super", worked for Barrera and Valladares as a bookkeeper, and was responsible for

12

entering information into a computer regarding drug transactions as directed by Valladares. Id., 152. Oyervides also collected money from Petitioner after each of the six jobs. Id., 151-2, 156. As part of his responsibilities, Oyervides met with Petitioner every two months or so to go over his accounts with Valladares and Barrera. Id., 277-81.

Regarding the $2 million money shipment, Oyervides was instructed by Valladares to meet Villareal in McAllen where Villareal was supposed to receive "a check" (cash) from Petitioner. Id., 281-82. On January 18, 2006, Oyervides met Villareal at a Logan's restaurant in a mall plaza. Id., 282-83. Oyervides was accompaned by Pepe Origel, called "kilos", and was driving a red pickup truck. Id., 283. Earlier that day, Petitioner had driven Oyervides to the drop off location in a black Avalanche. Id., 284. That night, Villareal was in a small white car. Id.

From Logan's, Oyervides led Villareal to the drop off location. Id. After the delivery, Oyervides met up with Petitioner at the same mall. Id., 285. Petitioner was in the black Avalanche, and Oyervides got into the car with him, and the two spoke for ten to fifteen minutes. Id.; (2 T.R., 6th Day, 14). According to Oyervides, Petitioner's sole role was to receive the $2 million from Atlanta. (2 T.R., 6th Day, 15). From there, the money was to go to Mexico, and a day or two later, Petitioner informed Oyervides that the money had been

13

delivered.  Id., 16.

Pursuant to a cooperation agreement with the government, Jose Luis Villareal testified that he collected money for Valladares, and took his orders from him.  (2 T.R., 8th Day, 146-47).  Generally, Villareal would pick up a car loaded with money and transport it to Valladares.  Id.  In January of 2006, Valladares instructed Villareal to make a money pickup in Atlanta.  Id., 148.  Villareal traveled to Atlanta and, there, met undercover agent Julio Alba.  Id., 148-50.  Villareal hired Alba to drive the money to McAllen.  Id.  Villareal took delivery of the money once it arrived in Texas, and was provided the keys at a Logan's Restaurant.  Id., 152.  From the restaurant, Villareal followed Oyervides to the drop-off location. Id., 153.  The money was removed from the minivan, and was counted inside the house by a person unknown to Villareal.  Id., 154-56.  While the money wsa being counted, another person arrived.  Id., 156.  After the money was counted, Villareal returned to Logan's Roadhouse, and dropped off the minivan with the keys inside.  Id., 156-57.  Oyervides picked up Villareal, and he and Kilos went into a Red Lobster to eat.  Id., 157. Before going into the restaurant, Villareal saw Oyervides walk over to someone in a black Avalanche.  Id., 157-58.  Villareal had seen the black Avalanche earlier, at the place where the money was counted.  Id., 158.

After the $2 million money shipment, an agent sought

14

authorization for wiretaps under Title III. (2 T.R., 2nd Day,
303). Wiretaps were authorized to intercept calls from Eden
Flores, Sr.'s Sprint phone, and from Isauro Casas's Boost prepaid
phone. Id., 304. Later, DEA intercepted calls from Petitioner's
telephone number, and from a telephone number of his brother,
Felix Alvarez. Id. Through the intercepts, and surveillance,
agents were able to identify various individuals, including
Gaudalupe and Abraham Hernandez. Id., 304-05.

The intercepts began on February 16, 2006. Id., 309.
Based on intercepted calls on February 20, 2006, surveillance
was set up the following day. Id., 311. Early the morning
of February 21st, surveillance was established at the residence
of Eden Flores, Sr., and at the home of Isauro Casas, where the
$2 million had been delivered on January 18th. Id. Casas was
followed to La Tejana Meat Market No. 1. Id. Flores left his
house, and traveled to the meat market. Id., 312. After a
few minutes, Flores left, and was followed by surveillance to
Rio Grande City. Id., 312. Casas was observed traveling behind
Flores. Id., 316. Casas turned onto Alvarez Road, and Flores
positioned himself nearby. Id. Fearing counter-surveillance,
Casas was not followed down Alvarez Road, but agents waited
for him to return. Id. Casas—followed by Flores—traveled
back toward Mission. Id., 317. Around La Joya, Hernandez asked
local officers to conduct a traffic stop of Casas. Id. Nothing
was found, and Casas was issued a warning citation. Id.

15

After Casas was released, he returned to his home. Id.,
318. Hernandez then observed an AOC commercial truck pull into
the property. Id., 320. Flores soon arrived. Id. The AOC
vehicle left Casas's property, and was followed to La Tejana
Meat Market No. 1. Id. Flores's vehicle left, and was followed
to La Tejana Meat Market No. 2. Id. Flores then traveled to
the La Plaza Mall in McAllen. Id., 323. Flores parked near
a white pickup truck, and a white SUV. Id. An individual was
standing between the two white trucks. Id. Flores soon drove
back to Casas's residence. Id., 324.

Surveillance officers saw a white SUV arrive at Casas's
residence. Id. Officers saw duffle bags loaded into the SUV.
Id. Flores left Casas's residence, followed by the SUV. Id., 324-25. Near
the McAllen City limits, a Mission Police Officer conducted a traffic stop of
the SUV. Id., 325; (2 T.R., 3rd Day, 9). Inside the duffle bags,
law enforcement found 217 kilograms of cocaine. Id., 9. Flores
returned to La Tejana Meat Market No. 2. Id., 11. Hernandez
observed two individuals in Flores's vehicle. Id., 13. At the
meat market, the passenger got out, and Hernandez indentified him
as Petitioner. Id., 13-14.

Based on information from the wiretaps, surveillance was
re-established on Flores. Id., 15. Flores returned to Casas's
residence, then left with two tanks in back of his truck. Id.,
16. The trucks were followed to Carla's Beauty Salon, and a
search warrant was executed there. Id., 16-17. Five tanks were

16

recovered. Id., 17. Each of the tanks had been modified with openings at the bottom. Id.

The government played numerous intercepted calls.[4] In a call intercepted on February 20, 2006, a reference was made to "El Feo", to see if he was working. Id., 36. In another call on February 20, 2006, Flores instructed Casas to get "El Feo" ready for tomorrow.[5] Id., 39-41. On the date of the seizure, calls between Flores and Casas, and Flores and Petitioner, were intercepted and pertained to events as they were on-going. Id., 43-4, 52-3, 55-60, 65, 67, 71, 73-5, 81. There were a number of intercepted calls after Casas was arrested. Flores also called Abraham Hernandez to advise him of Casas's arrest, and instructed him not to make any calls to Casas's phone. Id., 112, 115. Flores had a similar call with Negrete. Id., 117-18.

After the seizure, there were numerous intercepted calls between Flores and Abraham Hernandez, and Flores and Guadalupe Hernandez, monitoring Casas's case. Id., 126, 128-29, 131, 133, 135, 145, 149-51, 164.

In a call to Abraham Hernandez, Flores referred to "the browns," and "little boxes" which go "from house to house." Id., 136. Abraham advised Flores that he needed to call a

---

[4] Nearly all the calls were in Spanish language, and the government provided translations to the jury, but only as aids. (2 T.R., 3rd Day, 26-30, 32). They were not admitted in evidence. Id.

[5] "El Feo" was later identified as Mark Antonio Negrete. Id., 41.

friend, and Flores instructed Abraham to have it ready. Id.,
137. This call—and others—referenced an alternative method
of shipping cocaine to customers, via UPS. Id., 139-42, 153-54,
160. There were a number of calls between Flores and Petitioner
regarding $35,000 later seized from Flores' vehicle. Id.,
168-72, 174-75.

Residential searches at the homes of Casas, Flores,
Petitioner, and Abraham Hernandez yielded documents, records,
and firearms. (2 T.R., 3rd Day, 134-35; 2 T.R., 4th Day, 25-41,
28-34, 36-42, 44-50, 53-59, 61, 68-74; 2 T.R., 5th Day, 262-63,
266-68). The government called numerous law enforcement
witnesses who participated in the various stops, arrests, and
searches in which drugs, money, and firearms were seized.
(2 T.R., 5th Day, 92-110, 206-233, 239-40; 2 T.R., 6th Day,
105-119; 2 T.R., 7th Day, 9-17, 236-243, 265, 289; 2 T.R., 8th
Day, 11-17).

Cooperating witnesses added meat to the bone. Victor
Garcia learned from Petitioner that oxygen tanks were being
modified to transport cocaine. (2 T.R., 1st Day, 189-190).
Garcia saw an AOC truck at the Alvarez property on two occasions,
each time followed by Flores's gold dually. Id., 194. On one
occasion, Garcia helped load cocaine into the bottom of a tank.
Id., 189, 238, 274.

Marco Antonio Negrete ("El Feo") described his role in
transporting cocaine in oxygen tanks. (2 T.R., 6th Day, 204-05).

18

Negrete worked at AOC, and was solicited to transport cocaine in tanks by Abraham Hernandez. Id., 154. Negrete also worked with Flores, Casas, and Guadalupe Hernandez in this endeavor. Negrete also participated in the UPS shipments. Id., 157. In concert with Guadalupe and Abraham, and Flores, Negrete dropped off boxes filled with marihuana and cocaine at a UPS drop box. Id. Negrete was paid $300 to $400 on each occasion. Id., 157.

Negrete recalled picking up oxygen tanks on two occasions. Id., 167. On the first occasion, Negrete followed Flores to the location where two tanks were loaded and ready. Id. On the second occasion, Negrete picked up the tanks at an old house. Id., 168. Each time, Negrete dropped the tanks off at Casas's house. Id., 168. Negrete's second and last delivery was on February 21, 2006. Id., 169. After Negrete dropped off the tanks at Casas's house, he did not hear from him again. In intercepted calls, Flores told Negrete that Casas had been arrested, not to talk if approached, and not to call Casas. Id., 174-75, 178.

Despite the arrest of Casas, Negrete, Flores, and the Hernandez brothers continued shipping drugs by UPS. Id., 179-82. The packages were shipped to Lubbock, Dallas, and California, and Negrete was paid $400 for each drop off.[6] Id., 181-82.

_____

[6] In a later search of Flores's residence, a UPS label and a tracking slip, were recovered from a chair in the dining room, addressed to an individual in Lubbock. (2 T.R., 5th Day, 266-68). On arrest, Guadalupe Hernandez admitted that he provided the UPS labels. Id., 257, 264.

Negrete also picked up money for Flores at Abraham's request. Id., 186-94.

Petitioner now moves for relief under 28 USC Section 2255, arguing that he was denied his Sixth Amendment right to have effective assistance of counsel for his defense.

## I. PETITIONER HAD INEFFECTIVE ASSISTANCE OF COUNSEL FOR HIS DEFENSE.

### A. Counsel was ineffective for failing to object to the district court's declaration of a mistrial.

The United States Constitution guarantees that a defendant in a criminal case is entitled to have effective assistance of counsel. Glasser v. United States, 315 U.S. 60 (1942); McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970)(Sixth Amendment right to counsel is right to effective assistance of counsel).

A defendant alleging ineffective assistance of counsel must show that counsel's performance was deficient and that prejudice resulted therefrom. Strickland v. Washington, 466 U.S. 668, 687 (1984). In ineffective assistance of counsel claims, the defendant need only show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. Where the deficiencies in counsel's performance are severe and cannot be characterized as the product of strategic judgment, ineffectiveness may be clear. United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989); Ward v. United States,

995 F.2d 1337 (6th Cir. 1993); Workman v. Tate, 957 F.2d 1339, 1344-45 (6th Cir. 1992).

The jury in Petitioner's first trial began deliberating on November 24, 2008. (1 T.R., 11th Day, 156). On December 8, 2008, the Court declared a mistrial on the ground of "manifest necessity." (1 T.R., 19th Day, 8).

In the course of their deliberations, the jury communicated with the Court in a series of jury notes. (Exhibit B). Four of the notes pertained to scheduling and other matters of a housekeeping nature. (Exhibit B, Jury Notes 8, 13, 15, 17, and 19). In the remaining notes, the jury asked substantive questions, or requested materials and technical assistance in aid of their deliberations. The following is a summary of the jury's notes, and this Court's responses:

Jury Note 1: (11-24-08, 2:36 p.m.).

Jury asked for a status of the exhibits.

Jury Note 2: (11-24-08, 4:56 p.m.).

"The jury has not reached any agreement on any of the multiple counts. We request to be released for the day to return tomorrow. Thank you.

Jury Note 3: (11-25-08, 8:15 a.m.).

The jury requested a room with a large chalkboard or a dry erase board. The jury also requested that they be provided with the equipment to play the evidence, "CD's, wiretaps, etc."

The Court did not respond in writing to Notes 2 and 3, but advised the parties that the jury's requests were granted. (1 T.R., 12th Day, 4). The jury was provided with the supplies they

requested, and were released early.   Id.

Jury Note 4:   (11-25-08, 9:45 a.m.).

"Do we have to have a unanimous decision 12-0 in order to have a verdict?  (On every count).

In a written response, the Court informed the jury that whether guilty or not guilty, it must return a unanimous verdict on each count of the indictment.   The Court asked the jury to attempt to reach a verdict as to each defendant on which it could unanimously agree.  (1 T.R., 12th Day, 3-4).  (Exhibit C).

Jury Note 5:   (11-25-08, 12:01 p.m.).

"The attached CD Govt's Exhibit 25C does not want to play on computer.  We have attempted to troubleshoot."

Jury Note 6:   (11-25-08, 1:47 p.m.).

"We cannot play contents of attached CD (calls played in trial).  We also would like confirmation that we cannot have access to call transcripts."

(Exhibit B).  The Court advised the jury that the tape recordings could be played back, with the transcription aids, if the jury would inform the Court which specific calls it wished to hear. (1 T.R., 12th Day, 5-6). (Exhibit C).  The Court advised the parties that IT had been sent in to resolve the computer problem. (1 T.R., 12th Day, 7).

Jury Note 7:   (11-25-08, 2:11 p.m.).

The jury asked to listen to the conversations between Eden Flores and Mariano Alvarez, and between Eden Flores and Abraham Hernandez, and asked the Court for the transcripts.

(Exhibit B).  The Court asked the jury whether they still wished to have specific calls played back with the transcripts as aids.

(1 T.R., 13th Day, 5-6). (Exhibit C).   Pursuant to the jury's request, the prosecutor pulled the transcripts of the calls requested to be ready for playing the following day.  (1 T.R., 12th Day, 20-1).

Jury Note 9: (11-25-08, 3:24 p.m.).

The jury requested the definition of "launder/laundering" as it related to the case.  The jury advised the court that it attempted to find the definition in the jury charge but was unsuccessful.

(Exhibit B).  The Court responded to Jury Note 9 in writing, and defined laundering of monetary instruments as "knowingly using the proceeds of certain illegal activity to promote the carrying on of that activity." (1 T.R., Day 13, 3).  (Exhibit C). The Court directed the jury to the definition of the term in Counts Three, Five, Seven and Eight.  Id.

Jury Note 10:  (11-26-08, 8:49 a.m.).

The jury requested the password to unlock the computer so that they could play back the evidence.  The jury requested a more concise definition of aiding and abetting, and "dominion" in the possession instruction on page 7.

(Exhibit B).  In a written response, the Court instructed the jury that "dominion" had its ordinary meaning and "simply means 'control'" as stated on page 7 of the charge.  (1 T.R., Day 13, 7-9) (Exhibit C).

Though we cannot find Jury Note 11 in the Clerk's Record, the Court refers to it in conjunction with Jury Note 12.

Jury Note 12:  (11-26-08, (no time)).

The jury requested the testimony of Sgt. Juan Hernandez,

and Marco Negrete, including "all cross, re-direct, etc..."
(Exhibit B). In response to Jury Notes 11 and 12, the Court
called the jury into the courtroom, and a number of intercepted
calls were played. (1 T.R., 14th Day, 13-5).

Jury Note 14: (12-1-08, 11:42 a.m.).

The jury asked the court to replay, or produce,
specific question and answers: 1) Mr. Ramirez's question
to Victor Garcia if he were a habitual offender (looking
for answer); 2) Mr. Salazar asking IRS Agent Vogus (sic)
if she found any evidence of money laundering regarding
Eden F. or Mariano A. (looking for answer); 3) Mr. Vega
asking M. Negrete if the Hernandez brothers were involved
with the 217 kg seizure (looking for answer); and 4) Mr.
Vega asking Sgt. Juan Hernandez if the Hernandez brothers
are involved with the 217 kilo seizure (looking for answer).

(Exhibit B). In response to the note, the Court brought the
jury into the courtroom and played the portions requested.
(1 T.R., 14th Day, 19-22).

Jury Note 16: (12-1-08, 1:47 p.m.).

"We cannot agree on a unanimous verdict. Plaease advise."
(Exhibit B). The Court advised the parties that it wasn't going
to give an Allen charge, but was going to give the jury a nudge.
(1 T.R., 14th Day, 21). In a written response, the Court asked
the jury to continue deliberating in an effort to agree upon a
verdict. (Exhibit C). The Court asked the jury to consider
that the trial lasted two weeks, and that they had been
deliberating for three days. Id. The Court explained that it
was not unusual for deliberations to take much longer. Id. The
Court asked the jury to continue to deliberate in an effort to
reach a unanimous verdict. Id.

24

Jury Note 18:   (12-2-08, 9:56 a.m.).

The jury requested a new set of black and red markers.

Jury Note 20:   (12-3-08, 10:30 a.m.).

The jury asked the court to provide the person to unlock the computer—needed the password again.  The jury requested new pads of paper for their easels, and new markers because the ones provided were not conducive to handwriting "(and we are doing a lot of this)."

(Exhibit B).  The Court advised the parties that the jury's requests had been met.  (1 T.R., 16th Day, 3).

Jury Note 21:   (12-3-08, 2:17 p.m.).

The jury requested the password for the second computer since they couldn't play a CD on the first computer.

Jury Note 22:   (12-4-08, 9:34 a.m.).

The jury asked that both of the laptops be unlocked.

(Exhibit B).  The Court met the jury's requests.  (1 T.R., 17th Day, 3).

Jury Note 23:   (12-4-08, 11:43 a.m.).

The jury requested the transcript for phone number 909-770-9260-55.  The jury wanted to know who was the subscriber on this telephone, and wanted clarification of the speakers.  The jury had either Eden and Isauro or Eden and an unidentified male as the speakers.

(Exhibit B).  The Court brought the jury into the courtroom and played the relevant recordings.  (1 T.R., 17th Day, 9-10).

Jury Note 24:   (12-4-08, 1:53 p.m.).

The jury requested a time line or outline containing a sequential list of the intercepted telephone calls.  The jury advised that it was having difficulty organizing the calls, and the computer did not give them dates and times. The jury informed the court that they had had the opportunity to listen to the calls, but their notes on dates and times were not clear on the details.  The jury provided an example of what they were seeking.

(Exhibit B).  In the courtroom, the Court advised the jury that it could not submit an organizational chart or time line.  (1 T.R., 17th Day, 9).

Jury Note 25:  (12-4-08, 4:34 p.m.).

The jury requested a TV/VCR combo, or cables so that they could play the VCR tapes on a laptop.

Jury Note 26:  (12-5-08, 8:37 a.m.).

The jury asked that a laptop be unlocked.

On Friday, December 5, 2008, right at noon, the jury sent Jury Note 27: "May the foreperson speak to someone in private or the jury as a whole re: case."  The Court brought the foreperson, Juror No. 2, into the courtroom to speak privately.  (1 T.R., 18th Day, 4).  The foreperson informed the Court that, the day before, when the group was deliberating about one of the UPS labels, a juror asked whether a person could get a UPS label by walking into the store.  Id., 5.  That morning, the juror reported that he knew for a fact that anyone could pick up a UPS label at the store because he had done it.  Id.  The foreperson stated that the jury did not like the comment, and felt that it should be reported.  Id.

The Court informed the parties of the problem.  Id., 8.  The Court was of the view that the juror should be disqualified for violating the instructions, and replaced with an alternate.  Id.  Over the lunch hour, the Court planned to research the issue, and would contact the alternate juror to determine his status.  Id., 9.  Other alternatives would be to proceed with a jury of 11,

or declaration of a mistrial if the whole jury was tainted.
Id., 19, 11.

After the recess, Juror No. 6 was questioned by the Court.
Id., 23.  The juror related the same information to the Court
as provided by the foreperson.  Id.  The juror was dismissed.
Id., 29-30.  The Court informed the parties that the alternate
juror was available and prepared to report on Monday morning.
Id.  On Monday, the Court would admonish the jury not to consider
any statements made by Juror Number 6 to see if they could put
the juror's information out of their minds.  Id., 26-27.  The
Court planned to question the jurors individually.  Id., 28.
There were still the options of a mistrial, or proceeding with
a jury of 11.  Id., 27.  The Court was not inclined to declare
a mistrial on its own.  Id.

When court reconvened on Monday, December 8, 2008, the
Court solicited the parties' views.  (1 T.R., 19th Day, 3-4).
The prosecutor thought the best approach would be to seat the
alternate juror, if qualified.  Id.  In this event, the charge
would have to be re-read, and deliberations begun anew.  Id., 4.
Both Mr. Salazar and Mr. Ramirez requested that the alternate
juror be seated.  Id., 5, 7.  Mr. Vega preferred to proceed with
11 jurors.  Id.  Mr. Harkrider moved for a mistrial.  Id.

Without referencing Mr. Harkrider's motion, the Court
declared a mistrial, stating its basis as follows:

I think the jury is—this juror who engaged in misconduct,

27

it's just infected the jury and I don't know what other
areas of misconduct, but if—but at least we have
somebody disregards the Court's oath, the jury has been
unable to reach a verdict for two weeks and I just can
read or it's my belief that the jury is confused. I'm
worried that I can't cure what's been done by this juror
in disregarding the juror's instructions, and that the
best—the safest thing to do at this point is simply,
to start the case over and retry the case with a new jury,
clean jury that will follow the Court's instructions.

(1 T.R., 19th Day, 8). (Exhibit D). The Court advised the

parties that the case would be transferred to the Houston

Division for the new trial.

The Double Jeopardy Clause will not preclude a defendant

from being retried after the district court declares a mistrial

over defense objection if the mistrial was justified by "manifest

necessity." If a defendant consents to a mistrial, the "manifest

necessity" standard is inapplicable and double jeopardy ordinarily

will not bar a reprosecution. See United States v. El-Mezain,

664 F.3d 467, 559 (5th Cir. 2011).

This issue was raised on direct appeal. The Fifth Circuit

ruled that Petitioner's counsel failed to object to the district

court's declaration of a mistrial and the manifest necessity

standard did not apply. (Exhibit A). It is Petitioner's

position in this 2255 motion that his counsel provided ineffective

assistance of counsel when he failed to object to the Court

declaring a mistrial. Mr. Ramirez—Petitioner's counsel—requested

that the alternate juror be seated. (1 T.R., 18th Day, 5,7).

When the Court declared the mistrial, counsel did not object.

(1 T.R., 19th Day, 8). (Exhibit D). Thus, Petitioner was twice

28

put in jeopardy based on counsel's ineffectiveness.

The Supreme Court has recognized that a defendant has a "valued right to have his trial completed by a particular tribunal[,] [which] is now within the constitutional guarantee against double jeopardy..." Crist v. Bretz, 437, U.S. 28, 36 (1978)(quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 569 (1977)). "[T]he defendant has a significant interest in the decision whether or not to take the case from the jury." Arizona v. Washington, 434 U.S. 497, 508 (1978)(quoting United States v. Jorn, 400 U.S. 470 (1971)).

In this case, the Court abused its discretion in finding that the misconduct of one juror so infected the jury that it could not be cured. Juror Number 6's independent investigation of public access to UPS labels, which he conveyed to the jury, constituted extrinsic information outside the evidence. Where a colorable showing of extrinsic influence appears, the trial court must investigate the purported impropriety. United States v. Sotelo, 97 F.3d 782, 796 (5th Cir. 1996), citing United States v. Ruggiero, 56 F.3d 647, 652 (5th Cir. 1995). In such investigations, the key question is whether the intrusion affected the jury's deliberations and, hence, its verdict. Id. at 797, citing United States v. Ramos, 71 F.3d 1150, 1154 (5th Cir. 1995). A court's decision in handling complaints of outside influence on the jury are reviewed for abuse of discretion. United States v. Sotelo, 97 F.3d 782, 794, citing United States v.

Ramos, 71 F.3d 1150, 1153-54 (5th Cir. 1995).

In Sotelo, 97 F.3d at 795-96, the Fifth Circuit upheld the district court's refusal to grant the defendant's motion for mistrial where a juror claimed racial animus from her fellow jurors. In evaluating the issue, the district court brought the jury into the courtroom, and had the juror state her concerns. Id. at 796. After concluding that nothing had occurred to indicate racial bias or prejudice, the court instructed the jury to continue deliberating, to base their decision on the evidence, and not to take into account the race or national origin of any party or any witness in the case. Id. The Fifth Circuit found the court's techniques not ideal, but its investigation of the allegation of racial prejudice among the jury adequate. Id. at 797.

The recent decision in United States v. Diaz, 2012 WL 5910944 (5th Cir. Nov. 27, 2012)(unpublished) is closely on point. There, during deliberations, the foreman reported that a juror had conducted independent research on her cell phone, looking up the legal definition of "assault." Id. at 6. The judge conducted an ex parte voir dire of the jury, and advised them that even though one juror had conducted outside research, they were required to confine their deliberations to the court's instructions. Id. The court dismissed the juror, replaced her with an alternate juror, and deliberations continued. Id. The court denied Diaz's motion for a mistrial. Id. The Fifth

Circuit found the protocol followed by the court appropriate.
Id. at 7.  The trial court examined "the content of the extrinsic
material, the manner in which it came to the jury's attention,
and the weight of the evidence against the defendant," and found
no reasonable possibility that the jury's verdict was influenced
by the juror's improper conduct."  Id., citing United States v.
Ruggiero, 56 F.3d 647, 652 (5th Cir. 1995).  Under these
circumstances, the court's refusal to grant Diaz's motion for
mistrial was not an abuse of discretion.  Id.

Petitioner contends that the extrinsic information regarding
the UPS label was of little importance against the government's
overwhelming evidence in the case.  Though the Court originally
planned to question the jury as a whole to determine possible
taint, it chose not to do so, finding instead that the extrinsic
evidence regarding the UPS label was sufficient, in itself, to
taint the jury as a whole.  Having failed to follow appropriate
protocol, this Court abused its discretion in granting a mistrial
on the ground of jury taint.

Moreover, the Court's conclusion—that the jury would be
unable to reach a verdict based on the length of their
deliberations—is not supported by the record evidence.  Contrary
to this Court's statement, the jury had not been deliberating
for two weeks.[7]  Likewise, the record evidence does not support

_____

[7] The jury began deliberating on the afternoon of November 24, 2008,
deliberated all of November 25th, and for half a day on November 26th. (1 T.R.,
11th Day, 156, 158; 12th Day, 30; 13th Day, 3, 18). The jury deliberated
Monday, December 1, 2008, to December 5, 2008, when it notified the Court of
the juror's misconduct. (1 T.R., 14th Day, 3, 22; 15th Day; 16th Day, 5; 17th
Day, 17; 18th Day, 3). The jury deliberated seven days.

the Court's finding that the jury would be unable to reach a
verdict.  On December 1, after the four-day recess, in response
to a note, the Court pointed out that they had deliberated only
three days where the trial lasted two weeks.  (Exhibit C, Response
to Jury Note 16).  The jury never again informed the Court that
it could not reach a decision.  Rather, it is clear from the
jury's notes that it was carefully considering the evidence.

This Court's finding that the jury was unable to reach a
verdict based on the length of its deliberations was clearly
erroneous.

Additionally, the Court's belief that the jury was confused
is not supported by the record evidence.  Contrary to the Court's
statements, there is nothing in the record to suggest that the
jury was confused.  Twice, the jury asked for definitions in
the charge.  (Exhibit B, Jury Notes 6 and 10).  The jury's
notes were notably articulate and well-written, addressed specific
concerns on matters of substance, and reflected an impressive
attention to detail.  Given the number of telephone calls played
in the Spanish language, it is unsurprising that the jury asked
to rehear some of the intercepted calls, and narrowed its requests
to specific portions of specific calls.  There is no basis in
the record for the Court's finding that the jury appeared to
be confused.

Finally, there was no manifest necessity for declaring a
mistrial in this case.  "[T]rial judges may declare a mistrial

32

'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so." Renico v. Lett, 130 S.Ct. 1855, 1863 (2010)(quoting United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824).  As stated in Renico, "[t]he decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases.'"  Id. at 1863 (emphasis added).  A trial judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."  United States v. Jorn, 400 U.S. 470, 486 (1971); United States v. Rivera, 384 F.3d 49, 56, 58 (3rd Cir. 2004)("Crucially, a mistrial must not be declared without prudent consideration of reasonable alternatives.").

In Petitioner's case, there was the viable alternative of seating the alternate juror, who was present, an agreeable alternative to both the government and two defense counsel. There were no urgent circumstances, nor was it plain and obvious that a mistrial was necessary.

Under the facts and circumstances of Petitioner's case, there was no "manifest necessity" for the Court's decision to declare a mistrial without his consent and counsel provided ineffective

33

assistance when he failed to make a proper objection.  This
being so, Petitioner's right to be free from former jeopardy
was violated, and his convictions must be vacated.

> B.  Counsel was ineffective for failing to file
>     a motion for recusal or other written objections
>     to the transfer order.

As noted above, at the time it declared a mistrial, the
Court sua sponte transferred the case to the Houston Division
for retrial.  (1 T.R., 19th Day, 8). (Exhibit D).  The Court
informed the parties that it had obtained the Houston Division's
consent to the transfer, and the case would be heard there by
another judge.  Id., 14.  The Court advised the parties that
it had been asked to take the case with him to Houston, but
it was not interested in trying a case for a month in Houston.
Id., 15.  Counsel's request for a transfer to the Corpus Christi
Division, because three of the attorneys were from the Valley,
was denied.  Id., 14-5.

The matter of the Court's decision to transfer the case to
the Houston Division for retrial was revisited at a status
conference held in McAllen on February 26, 2009.  (Exhibit E).
Though the Court had not wanted to retry the case, and wanted a
Houston judge to hear it, that option was off the table.  Id., 6.

Petitioner's counsel stated that he was going to file a
recusal motion.  This was based on counsel's belief that the
Court was jury shopping.  (Exhibit E at 5-6).  The Court gave
counsel two weeks to file his motion.  Id., 13.  Counsel failed

to file his motion.

This issue was raised on direct appeal and denied.  In its opinion the Fifth Circuit stated that the district court gave the parties two weeks to file any additional motions. "None of the Appellants filed a motion for recusal or other written objections to the transfer order."  (Exhibit A at 6). Petitioner submits that counsel provided ineffective assistance when he failed to file his motion for recusal or other written objections to the transfer order.

On direct appeal, counsel relied on United States v. Garza, 593 F.3d 385 (5th Cir. 2010).  But the Garza court held that its holding "is limited to the rare instances where the district judge orders a transfer, sua sponte and over a defendant's objections, and fails to give due consideration to Rule 18 when those factors overwhelmingly advise against transfer." (emphasis added).  Petitioner lost this issue on direct appeal because counsel failed to make a proper objection when given the opportunity to do so.

This case is very similar to the Garza case.  All the defendants lived in the Rio Grande Valley.  All of the attorneys, other than Mr. Salazar, had their offices in the Valley.  The Court sat in the McAllen Division of the Southern District.  Nearly all of the many law enforcement witnesses worked in the Valley.  So, too, nearly all of the acts which served as the  basis of the charges occurred in the Valley.

35

The driving distance between McAllen, Texas, and Houston, Texas, is 347.5 miles, with an estimated driving time of 5 hours 17 minutes.  See www.randmcnally.com/mileage-calculator.do.

Petitioner was the only one in the courtroom because his family and friends were unable to attend based on the distance. Petitioner's wife, parents, brother, or son did not attend the trial because they could not drive that far every day.  Counsel's failure to make a proper objection and bring all of the above to the Court's attention resulted in Petitioner receiving ineffective assistance of counsel.

Based on all of the above, Petitioner's convictions should be vacated.

### C.  Counsel was ineffective for failing to negotiate a plea after the mistrial.

The right to effective assistance of counsel extends to the plea-bargaining process during which all criminal defendants are "entitled to the effective assistance of competent counsel." Lafler v. Cooper, 132 S.Ct. 1376 (2012)(internal quotation marks omitted); see also Missouri v. Frye, 132 S.Ct. 1399, 1407 (2012) ("In today's criminal justice system...the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.").

The decision to plead guilty--first, last, and always--rests with the defendant, not his lawyer.  Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a

36

chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequences of a conviction. Smith v. United States, 348 F.3d 545, 552 (6th Cir. 2003). "On the other hand, the attorney has a clear obligation to fully inform her client of the available options." Id. "The duty of defense counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial." Miller v. Straub, 299 F.3d 570, 580 (6th Cir. 2002).

Closely associated with the duty to inform the client of available options is the attendant obligation of conducting "reasonable investigations or [reaching] a reasonable decision that makes particular investigations unnecessary." Strickland v. Washington, 466 U.S. 668, 691 (1984). "Counsel cannot responsibly advise a client about the merits of different courses of action, [and] the client cannot make informed decisions... unless counsel has first conducted a thorough investigation...." Dickerson v Bagley, 453 F.3d 690, 694 (6th Cir. 2006) "[S]trategic choices made after thorough investigations of law and facts relevant to plausible options are virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. "It is not reasonable to refuse to investigate when the investigator does not know the

37

relevant facts the investigation will uncover." <u>Dickerson</u>, 453
F.3d at 696.  If an attorney's "failure to investigate does not
reflect sound professional judgment," deference to the attorney's
purported strategic choices is "not appropriate." <u>Dando v.
Yukins</u>, 461 F.3d 791, 799 (6th Cir. 2006).

In the present case, after the mistrial, Petitioner wanted
to enter into a plea bargain.  (Exhibit F).  This did not
happen because counsel did not contact his client between the
time of the mistrial and the start of the second trial.  The
reason counsel did not contact his client is because of the fee
arrangement.  Counsel was waiting for Petitioner's family to
give him more money for the second trial.  When that money
did not come quick enough, counsel moved to withdraw from
representing Petitioner.  (Exhibit G).  When counsel finally
got his money, the motion to withdraw was withdrawn.  <u>Id</u>.
Petitioner finally seen his counsel on the morning of the trial
when the new jury was being picked.  There was no time to consult
with his counsel at this point because counsel was busy picking
the jury.  Thus, counsel did not make a reasonable investigation
or reach a reasonable decision that makes particular investigations
unnecessary.  <u>Strickland</u>, supra.  He did not consult with his
client or contact the prosecutor to discuss a plea bargain,
resulting in Petitioner receiving ineffective assistance.  <u>See
Hawkman v. Parratt</u>, 661 F.2d 1161 (8th Cir. 1981)(While no duty
to initiate plea negotiations, the failure to do so may be

deficient under circumstances of a particular case.)

Remedies for the deprivation of the Sixth Amendment right to the effective assistance of counsel "should be tailored to the injury suffered from the constitutional violation." United States v. Morrison, 449 U.S. 361, 364 (1981); United States v. Day, 969 F.2d 39, 47 (3rd Cir. 1992). Here, Petitioner should be afforded the opportunity to renew pretrial bargaining, with a new trial to result if negotiations fail. Commonwealth v. Napper, 254 Pa. Super 54, 385 A.2d 521 (1978); Turner v. Tennessee, 858 F.2d 1201 (6th Cir. 1988); Day, supra.

### D. Counsel was ineffective when he gave Petitioner incorrect information regarding an open plea.

Where counsel is aware that the evidence against a defendant is "overwhelming" and the defendant has advised him that he will not cooperate, counsel's performance is deficient if he does not advise defendant of the option to plead without cooperation. United States v. Booth, 432 F.3d 542, 549-50 (3rd Cir. 2005).

To establish prejudice, Petitioner "need not prove with absolute certainty that he would have pleaded guilty, that the district court would have approved the plea arrangement, and that he therefore would have received a lesser sentence." United States v. Day, 969 F.2d 39, 45 n. 8 (3rd Cir. 1992). Moreover, "Strickland v. Washington, does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case."

39

Id. (quoting Strickland, 466 U.S. at 693-94).  In this context, to satisfy the prejudice inquiry, the defendant "must demonstrate that, but for his...attorney's alleged ineffectiveness, he would have likely received a lower sentence." Booth, 432 F.3d at 547.

In Booth, the Court held that had defendant's counsel informed him of the possibility of entering into an open plea, defendant may have opted to plead guilty and "would have likely received a three-level reduction for acceptance of responsibility. [Defendant] was prejudiced because, by proceeding to trial and becoming ineligible for the three-level adjustment for acceptance of responsibility, he was exposed to an additional 19 to 30 months imprisonment." Id. at 548-49.  Accordingly, the defendant could demonstrate prejudice. Id. at 549; accord Day, 969 F.2d at 44; United States v. Day, 285 F.3d 1167, 1172 (9th Cir. 2002). Also see United States v. Turner, 2007 U.S. Dist. LEXIS 37844 (N.D. Tex. May 23, 2007); United States v. Salazar-Lopez, 2007 U.S. App. LEXIS 25225 (9th Cir. Oct. 24, 2007); United States v. Felix-Carrazco, 2007 U.S. Dist. LEXIS 39733 (Dist. of Idaho May 31, 2007).

In this case, Petitioner's counsel advised him that he would receive life if he entered a plea of guilty.  This was based on counsel's belief that his guideline offense level was 46, and a three-level reduction would bring it to level 43, requiring a life sentence.  This information was incorrect.