IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| MARIANO ALVAREZ, | § | |
| Petitioner, | § | |
| | § | Case No. 7:15-CV-00280 |
| v. | § | |
| | § | Case No. 7:07-CR-00144-1 |
| UNITED STATES OF AMERICA, | § | |
| Respondent | § | |

## UNITED STATES' RESPONSE TO MOTION FOR RELIEF UNDER 28 U.S.C. § 2255 AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter, "the government," by and through the United States Attorney for the Southern District of Texas, files this Response to Mariano Alvarez (Alvarez)'s Motion to Vacate, Set, Aside or Correct Sentence under 28 U.S.C. § 2255 and Motion for Summary Judgment. In support thereof, the government would show the Court the following:

# I.

## COURSE OF PROCEEDINGS AND JURISDICTION

Mariano Alvarez (Alvarez) challenges the judgment of conviction and sentence imposed by the Court (Crane, J) on December 2, 2009, and entered by the district clerk on May 10, 2010 (DE-729). Alvarez appealed from the conviction and sentence. On April 8, 2014, the United States Court of Appeals for the Fifth Circuit filed an unpublished opinion affirming Alvarez's conviction and sentence on April 8, 2014 (DE-889, 891, 892). *United States v. Mariano Alvarez, Eden Flores, Abraham Hernandez, Guadalupe Hernandez,* 561 Fed. Appx. 375 (5th Cir. 2014). Alvarez did not file a petition for writ of certiorari in the Supreme Court of the United States consequently his conviction became final on July 8, 2014, the last day on which he could have filed a petition for certiorari. *Clay v. United States*, 537 U.S. 522, 532 (2003).

On June 22, 2015, Alvarez filed a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. The district clerk docketed the case as Case No. 7:15-CV-00280 (DE-899). Alvarez's motion is timely filed within the one-year limitation proscribed under 28 U.S.C. §

2255(f)(1). This Court is vested with jurisdiction under 28 U.S.C. § 2255.

## II.

## GROUNDS FOR RELIEF

In his several complaints for relief under 28 U.S.C. § 2255, Alvarez contends that his conviction stems from the abrogation of his Sixth Amendment right to the effective assistance of counsel. He specifically contends that his attorney's efforts in his behalf were deficient in the following respects:

**A.** Alvarez contends that his attorney's failure to object to the district court's declaration of a mistrial was unreasonable;

**B.** Alvarez asserts that his attorney's failure to lodge objections to the Court's order transferring the case from McAllen to Houston was unreasonable;

**C.** Alvarez contends that his attorney's failure to negotiate a plea agreement after the mistrial was unreasonable;

**D.** Alvarez complains that his attorney gave him incorrect information regarding an "open plea;" and

**E.** Alvarez asserts his attorney's failure to lodge objections to the Court's calculation of his sentence under the advisory sentencing guidelines was unreasonable.

## III.

## STATEMENT OF FACTS

**A.    Course of proceedings**

The prosecution of Case No. 7:07-CR-00144 began on February 27, 2007, when the Grand Jury filed the original indictment.  Seven (7) individuals were alleged to have conspired to possess with the intent distribute a controlled substance, to wit, more than five (5) kilograms of cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A) (Count One). Defendants 1 and 3 were not identified; the Grand Jury identified the following defendants: Eden Flores, Eden Flores, Jr. (Flores Jr.), Marco Antonio Negrete (Negrete), Anwar Deluna (Deluna), and Eduardo Guerra (Guerra) (DE-55). In count two, Flores, Jr., Deluna, and Guerra were alleged to have possessed with intent to distribute approximately one kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). In count three, Flores, Flores, Jr., and Negrete were charged with possession with intent to distribute 217 kilograms of cocaine, a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Under count four, Guerra was charged with possession with intent to distribute 500

grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (DE-55).

The indictment was superseded on October 9, 2007. In the Superseding Indictment, Case No. 7:07-CR-00144-S1, the Grand Jury identified the following defendants: Alvarez, Flores, Isauro Casas (Casas), Flores, Jr., Negrete, Deluna, Guerra, Guadalupe Hernandez (Guadalupe), Abraham Hernandez (Abraham), Jose Luis Villareal (Villareal), and Felix Alvarez (Felix). Count one charged several of the defendants with conspiracy to possess with intent to distribute more than five kilograms of cocaine. Under count two, Alvarez, Flores, Casas, Villareal, and Felix were charged with conspiracy to commit the offense of money laundering in violation of 18 U.S.C. § 1956(h). The third count charged Alvarez with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(1)(i). Count four saw Flores, Jr., Deluna, and Guerra charged with possession with intent to distribute more than 500 grams of cocaine. Under count five, Alvarez, Casas, and Villareal were alleged to have committed the offense of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). In count six, Alvarez, Flores, Casas, Flores, Jr., Negrete, Guadalupe, and Abraham were charged with possession

with intent to distribute 217 kilograms of cocaine. Alvarez and Flores were alleged to have committed the offense of money laundering in count seven. Alvarez and Felix were charged with money laundering under count eight. In count nine, Guerra was charged with possession with intent to distribute more than 500 grams of cocaine. Under counts ten and eleven, Guerra was charged with unlawful possession of a firearm by a convicted felon and possession of firearms in furtherance of a drug trafficking offense in violation of 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A)(i). Under count twelve, Guerra was charged with unlawful possession of a short-barreled rifle in violation of 26 U.S.C. § 5861(d) (DE-154).

The Grand Jury filed a Second Superseding Indictment, 7:07-CR-00144-S2 on July 29, 2008. In the Second Superseding Indictment, the defendants identified in the Superseding Indictment were charged with the following offenses: conspiracy to possess with intent to distribute more than five kilograms of cocaine (count one), possession to commit the offense of money laundering (count two), money laundering (count three), possession with intent to distribute one kilogram of cocaine (count four), money laundering (count five), possession with intent to

distribute 217 kilograms of cocaine (count six), money laundering (counts seven and eight), possession with intent to distribute three kilograms of cocaine (count nine), unlawful possession of a firearm by a convicted felon (count ten), possession of firearms in furtherance of a drug trafficking offense (count eleven), and possession of a short-barreled rifle (count twelve) (DE-314).

Alvarez, Flores, Guadalupe, and Abraham entered pleas of not guilty to the charges alleged in the Second Superseding Indictment on August 7, 2008. On these pleas, the case proceeded to trial before a jury beginning November 5, 2008. Flores, Jr., Negrete, Deluna, Guerra, and Villareal entered guilty pleas (Guadalupe PSR ¶¶ 15, 16, 31, 32, 34).

On November 10, 2008, the jury began to receive evidence (DE-471, 472). The evidence closed and the district court submitted its charge on November 24, 2008 (DE-390). During its deliberations from November 24, 2008, to December 5, 2008, the jury filed 27 jury notes (DE-418 through DE-443). Jury Note Number 27, filed on December 5, 2008, augured concern among the jury respecting one of its members. The jury foreperson requested a confidential meeting (DE-443).

The district clerk's minutes reflect that the district judge addressed questions regarding Juror No. 6 and ultimately dismissed that juror from service. An oral motion for a mistrial was filed and taken under advisement. Later the district court granted the motion for mistrial and caused the case to be transferred from the McAllen Division of the Southern District of Texas to the Houston Division.

On February 26, 2009, the district court convened a status conference. The district judge declared that he planned to retry the case in July 2009, in Houston. Alvarez's attorney requested a pretrial conference to resolve any pending matters including any motions to recuse the district court. The court instructed the attorneys to file any additional motions within two weeks and declared that he would set the matter for a status conference to resolve any pending issues.

The retrial commenced on July 6, 2009. On July 20, 2009, the parties rested and the case was submitted to the jury. On July 21, 2009, the jury found Alvarez guilty of the charges alleged in Counts One, Two, Three, Five, and Six and not guilty of the charges alleged in Counts Seven and Eight (DE-711). Flores, Sr. was found guilty of the charges alleged in Counts One, Two, and Six (DE-712). Guadalupe and

Abraham were found guilty of the charges alleged in Counts One and Six (DE-713, 714).

The district court imposed the sentences on December 2, 2009. The court remanded Alvarez into the custody of the Bureau of Prisons to serve concurrent life terms of imprisonment on Counts One and Six and concurrent 240-month terms of imprisonment on Counts Two, Three, and Five.  The terms of imprisonment are to be followed by concurrent life and three-year terms of supervised release.  The court ordered Alvarez to pay mandatory assessments totaling $500 and a $1,000,000 fine (DE-728).

## B.    Facts underlying the conviction

### 1.    Prelude: How the removal of a juror resulted in a mistrial and transfer of the case to Houston

On December 5, 2008, the 18th day of the trial of Alvarez, *et al.*, the deliberating jury sent the district judge a jury note, Jury Note 27 (DE-443). In this note, the jury foreperson requested a confidential conference with the judge, "We have a concern regarding a juror may the foreperson speak to someone in private or the jury as a whole re: case." Upon receiving the note, the judge summoned the attorneys back

to court from lunch, advised them of the note, and told them he would discuss it with the foreperson (DE-704, p. 2661).

The courtroom was cleared and the foreperson was brought in. The foreperson advised the court that the jury had been deliberating the propriety of simply walking into a UPS store and walking out with a Saturday address label (DE-704, pp. 2662-63). During the discussion, one of the jurors declared that he knew it could be done because he had walked into a UPS store the day before and done it. The foreperson declared the jury did not appreciate the juror's comment. For her part, the foreperson thought the effort constituted a personal investigation of the sort the court had prohibited at the beginning of the trial (DE-704, p. 2663).

The judge asked the foreperson to identify the errant juror. The foreperson identified the juror who had engaged in the controversial conduct and told the judge she had showed him and the entire jury the note she proposed to send to the court (DE-704, pp. 2663-64). The judge instructed the foreperson to return to lunch while he and the lawyers considered an appropriate response (DE-704, pp. 2664-65).

After the foreperson left, the lawyers returned to the courtroom. The court summarized his discussion with the foreperson and observed that the juror's conduct raised the issue of whether the juror who engaged in his own investigation should be disqualified (DE-704, p. 2666). The court thought the juror should be disqualified and the jury could continue to deliberate with an alternate juror. Flores' attorney demurred; he noted that the jury had been deliberating for 8 days without the alternate who would have to be brought up to date with respect to the deliberations from day one (DE-704, pp. 2667-68).

Later, the judge declared that he intended to disqualify the juror. Before doing so, however, he needed to determine the context of the juror's reported misconduct, that is, the nature of the issue being deliberated when the juror initiated his unauthorized investigation (DE-704, p. 2670). The judge explained that he was going to bring the juror in and examine him from the bench (DE-704, p. 2671).

Flores' attorney demurred once again.  Counsel observed that, although they would be able to hear the juror's side of the story, he and his fellow lawyers were not privy to the foreperson's discussion with the judge (DE-704, pp. 2671-72). Alvarez's attorney joined Flores' in this

11

demurrer. The court acknowledged counsels' concerns and played the recording of his conference with the foreperson for them (DE-704, pp. 2675-79).

Juror No. 6, the juror in controversy, told the judge that the jury was discussing the legality of walking into UPS and grabbing labels. Juror 6 told his fellow jurors it was legal because he just stopped at the UPS box the night before and grabbed one (DE-704, p. 2681).

The judge declared that he was going to disqualify Juror No. 6 (DE-704, p. 2682). Abraham's lawyer objected to the juror's disqualification; the judge overruled the objection (DE-704, pp. 2683-84). The discussion then turned to the issue of whether the jury should continue to deliberate with eleven jurors or with an alternate or whether Juror No. 6 had so tainted the jury's deliberations as to require a mistrial (DE-704, pp. 2684-85). All defense counsel objected to proceeding with 11 jurors (DE-704, p. 2685). Flores' counsel moved for a mistrial, a motion the judge deemed premature (DE-704, p. 2686). The court recessed the case for the weekend to consider the appropriate course of action in light of Juror No. 6's dismissal (DE-704, p. 2691).

On December 8, 2008, the 19th day of trial and the 9th day of jury deliberations, the district court asked the parties how they wished to proceed in light of the disqualified juror. The government suggested proceeding with the alternate juror. The prosecutor qualified this suggestion with the observation that they would have to see how much influence the dismissed juror had on the jury's deliberations and that the court would have to submit its charge to the jury a second time (DE-705, pp. 2696-97).

Flores' attorney withdrew his request for an *Allen* charge and his request for a mistrial (DE-705, pp. 2697-98). Flores agreed with the suggestion that they proceed with the alternate juror but was concerned with how the jurors would respond to the suggestion that they had to start over (DE-705, pp. 2698-99). Alvarez agreed with Flores' and the government's suggestion that they proceed with the alternate juror (DE-705, p. 2700).

Guadalupe parted company with his co-defendants and declared that he would prefer to proceed with eleven jurors (DE-705, p. 2700). Abraham moved for a mistrial citing the length of the deliberations in light of the relative simplicity of the case (DE-705, pp. 2700-01).

The judge declared that he was inclined to grant a mistrial. The court cited the jury's inability to reach a verdict over two weeks of deliberations and the very real probability that the dismissed juror had adversely affected the jury's deliberations. The court declared a mistrial and observed that the case would be transferred to Houston (DE-705, p. 2701). After the court dismissed the jury (DE-705, p. 2706), Alvarez asked the court if it would consider transferring the case to Corpus Christi for the convenience of the Rio Grande Valley attorneys. The court declared the trial would be held in Houston (DE-705, p. 2707).

### 2.   Prelude, Part 2: Revocation of Guadalupe's Bond and Other Miscellaneous Pre-trial Concerns

The wisdom of transferring the case from the McAllen Division to the Houston Division became apparent on July 6, 2009. Before a jury was selected to hear the case in Houston, the government filed a motion to revoke Guadalupe's bond (DE-753, p. 2949). The prosecutor averred that the government had initiated an investigation following the disqualification of Juror No. 6 on December 5, 2008. The government suspected jury tampering; the investigation confirmed it (*Id*).

According to the prosecutor, the government had secured two witnesses who would testify that Guadalupe met with Juror No. 6 and

that Guadalupe accompanied Juror No. 6 to the UPS store when he picked up the UPS labels (DE-753, p. 2949-50). Later, one of these witnesses wore a wire and engaged Juror No. 6 in conversation. During this conversation Juror No. 6 acknowledged his "meetings" (*sic*) with Guadalupe (DE-753, p. 2950).

Guadalupe, through his attorney, objected to revocation of his bond solely on the assertions of the prosecutor. The court met this objection with the observation that it was acquainted with the evidence that had been filed under seal. The prosecutor declared that the government was prepared to offer the testimony of Special Agent Zerda conditioned on the fact that the investigation was continuing (DE-753, p. 2950). The prosecutor asked the judge to recall that the probation officer in McAllen had alleged that Guadalupe had been in contact with the female jurors during the trial (DE-753, p. 2951). The case agent confirmed the prosecutor's several averments (*Id*).

The judge overruled Guadalupe's objections and revoked his bond. The court declared he was aware of the investigation and had serious reservations about Guadalupe's behavior during the trial in McAllen

(DE-753, p. 2952).[1] Shortly after the trial in Houston began, Juror Number 6 confessed and implicated Abraham. The district court revoked his bond as well (DE-772, pp. 259-263).

After some discussion regarding trial logistics and outstanding motions, voir dire began (DE-753, p. 2964). During voir dire, the district judge asked if anyone was acquainted with Flores' attorney, Mr. Baltazar Salazar. A member of the venire raised his hand and asked what church Mr. Salazar attended. The judge quipped, "I'm surprised he goes to church. Just kidding. A little levity." (DE-753, p. 2976). Counsel advised the court he attended a Catholic Church in Missouri City, Texas; the panel member declared he also attended a Catholic Church in Missouri City (*Id*). The panel member declared that his and Mr. Salazar's membership in the Knights of Columbus would affect his ability to be impartial (DE-753, pp. 2977-78). Neither Mr. Salazar nor his client cited any concern respecting the judge's venture into light

---

[1] The probation officer summarized the results of the investigation conducted by the Federal Bureau of Investigation in Guadalupe's pre-sentence investigation report (PSR): "The investigation indicates that Guadalupe Hernandez not only met with and discussed the case with the juror, Maximo Gonzalez, but also provided him with information and material (United Parcel Shipping labels) which were pertinent to the case." (Guadalupe-PSR ¶ 107).

16

humor at that time. The remainder of jury selection process proved to be unremarkable (DE-753, pp. 2978-3033).

Before the jury was seated and received any evidence, Flores asked the court to strike the panel in light of the judge's aside regarding counsel's church attendance (DE-753, p. 2186). The judge responded that the remark was meant as a joke. Flores' attorney persisted in his objection: he believed the jury was tainted because the court had indicated it did not believe him to be an individual who attended church (DE-753, p. 2186-7).

The prosecutor noted that the court had indicated the remark was not to be taken seriously and was not meant to impugn counsel's integrity (DE-753, p. 2187). The judge denied Flores' motion to strike the panel (*Id*).

### 3.   Trial: tires and trucks full of money and cylinders, boxes and duffle bags full of cocaine

#### a.   A tire full of money

Nicholas Juarez of the Alice, Texas, Police Department was on patrol on Texas Highway 16 just north of Freer, Texas on April 21, 2005 (DE-753, p. 2242). Officer Juarez was driving north on Highway 16 (TH-16) when he was passed by a southbound Ford F-350 dually pickup

truck. Glancing into his rear view mirror, Officer Juarez noticed that the license plate light was defective. The officer instantly turned and initiated a traffic stop (DE-753, pp. 2245-46, 2279; DE-772, p. 343).[2]

The driver of the Ford dually was Mariano Alvarez (DE-753, p. 2246). Alvarez got out of the truck and provided Officer Juarez his driver's license and other information. Officer Juarez took Alvarez to the back of Alvarez's truck and showed him where the license plate light was out (*Id.*, p. 2247). At the same time, Officer Juarez's fellow officer, Duval County Deputy Sheriff Gabriel Louetta, scanned the area around the detained conveyance. Officer Juarez observed that that particular area was notorious "for all types of illegal activities, smuggling aliens, and a lot of times we have bailouts where they'll jump out of the vehicle as soon as we either approach it or make contact with the driver" (DE-753, p. 2247, 2290).

After a brief conversation with Alvarez, Officer Juarez initiated a records check and then went to make contact with Alvarez's passengers – Victor Garcia and Manuel Acevedo (DE-753, p. 2248; DE 772, p. 207).

---

[2] The traffic stop was recorded on Officer Juarez's dashboard camera. This camera activates automatically when the officer turns on the vehicle's emergency lights (DE-753, pp.2242-43; Government Exhibit 26-V.

Officer Juarez remarked that Alvarez was wearing a utility belt – a circumstance that piqued the officer's curiosity. Officer Juarez explained that on occasion drivers would dress as if he or she worked in the area of the stop, e.g., as an oil field worker (DE-753, pp. 2249-50, 2278). Alvarez had told the officer that he was coming from San Antonio where he reportedly sold a front end loader and a trailer and was on his way back to Rio Grande City. Alvarez told Officer Juarez he had sold the front end loader for $80,000. The deal was reportedly closed with a wire transfer although Officer Juarez did not find any receipts for a wire transfer on April 21, 2005 (DE-753, 2286, 2288, 2311). Officer Juarez thought that an individual wearing a belt like that on a long trip would be uncomfortable (*Id.*, p.2251, 2284).

While he was interviewing the passengers, Officer Juarez spotted some luggage. The passengers seemed uncertain as to where they were coming from but eventually confirmed Alvarez's response: they were coming from San Antonio. The presence of the luggage struck the officer as odd – why did they need luggage if they did not stay anywhere overnight (DE-753, p. 2252-53)? Officer Juarez secured Alvarez's consent to search the car (DE-753, p. 2252).

During the search, Officer Juarez noted some unusual marks in the vicinity of the spare tire – some fresh scrape marks. Alvarez told Officer Juarez he had a flat tire earlier that day (*Id*. p. 2254-55). Officer Juarez asked if he could take a closer look at the tire; Alvarez secured the tire tool and attempted to lower it to facilitate the officer's inspection.  The tire could not be lowered – Alvarez did not have the extension one needed to lower the spare tire (DE-753, p. 2256-58). Officer Juarez informed Alvarez that he needed an extension to lower the spare tire and Alvarez did not seem to have it in his possession. The officer explained that without that extension Alvarez could not have lowered the spare tire that day. Officer Juarez asked Alvarez if he would follow him to a tire shop in Freer, Texas, to see if they could drop the spare tire. Alvarez consented (DE-753, pp. 2258-59).

Officer Juarez summoned an associate from the narcotics task force to the tire shop. His associate arrived with the chief of the Freer, Texas, Police Department. The police chief brought an instrument Officer Juarez called a "density meter." The density meter measured density within the tires of a vehicle. The density of the spare tire on Alvarez's vehicle measured up to 111; the other tires on the conveyance

were consistently in the 40 to 45 range (DE-753, pp. 2260-61). The density of the spare tire gave Officer Juarez probable cause to believe that something was hidden in it (*Id.,* 2261, 2292).

Another officer arrived at the tire shop in a truck similar to Alvarez's. This officer had the extension that was needed to lower the spare tire. As the tire touched down, Officer Juarez remarked that it was very heavy. He passed the tire to his task force partner who rolled it away from the truck. As the tire rolled, the officers heard "stuff rolling inside" (DE-753, p. 2262). The tire was opened up and the officers discovered that the "stuff rolling inside" was a large amount of currency (DE-753, p. 2262-64; Government Exhibit 26-I, K, L). Officer Juarez thought the tire concealed $279,995 in United States currency which was wrapped in vacuum sealed cellophane baggies (DE-753, p. 2264, 2310; DE-772, p. 220).[3] Officer Juarez observed that it was common for narcotics traffickers to transport drug-trafficking proceeds in this manner (DE-753, p. 2310).

---

[3] This evidence is germane to the allegations of Counts Two and Three of the second superseding indictment, to wit, conspiracy to commit the offense of money laundering and money laundering on April 21, 2005.

Texas Department of Public Safety (DPS) Lieutenant Ronald Saenz interviewed the occupants of the Ford dually on April 21, 2005 (DE-772, p. 200). Alvarez told Lieutenant Saenz that they were coming from San Antonio where Alvarez had sold equipment; he denied having been anywhere other than San Antonio (DE-772, pp. 202, 209). When asked if he was aware of the cash concealed in his spare tire, Alvarez confessed that he was – he declared he had put it there. Alvarez told Lieutenant Saenz that the money represented the proceeds from the sale of the equipment (DE-772, pp. 204, 210). Apparently Alvarez was under the impression that the money was safer in a spare tire on his truck rather than in a bank – he told Lieutenant Saenz that he had no intention of depositing it in a bank (DE-772, pp. 205, 214).

Victor Garcia worked for his cousin Mariano Alvarez. Victor worked on Alvarez's ranch and for Alvarez's construction company, "Rancho Girasoles." He started by doing work around the ranch but later was engaged in storing and taking care of marijuana (DE-772, pp. 321-22, 379-81). Victor reported he was paid about $100 a night for storing the marijuana (DE-772, p. 329). Victor enjoyed a five-year hiatus from his employment with his cousin when he went to prison in

1995 for possession of marijuana (DE-772, p. 330, 382). This conviction was wholly unrelated to Alvarez's marijuana-trafficking efforts (DE-772, p. 330, 378 382).

Upon completion of his prison term, Victor resumed his work for Alvarez. He started out with ranch work, planting trees, eventually graduating to storing marijuana overnight (DE-772, p. 333).

Victor and another cousin, Manuel Acevedo, were traveling with Alvarez on April 21, 2005 (DE-772, p. 335). According to Victor, he drove a dump truck to San Antonio where it was to be sold. While in San Antonio, Alvarez planned to pick up some money in addition to the proceeds from the sale of the dump truck and other heavy equipment. The additional money was not in San Antonio – they had to drive to Dallas to pick it up (DE-772, p. 336). Victor related that they arrived in Dallas sometime in the evening. He based this on the fact that they had dinner at a Red Lobster after their arrival (DE-772, p. 337).[4]

According to Victor, after they picked the money up in Dallas, they retreated to a secluded house with an attached garage where they unloaded a spare tire and then put the money in it. They placed the

---

[4] The government corroborated this testimony with Red Lobster receipts dated April 20, 2005, and attested to by the restaurant's manager, Carl Lee (DE-772, p. 173).

money-laden spare tire under the truck in the place designed for it (DE-772, p. 338). To unload the spare tire, Alvarez, Victor, and Acevedo went to a Home Depot to purchase a compressor (DE-772, pp. 339-41).[5] Once the money was loaded and the tire replaced, they started back toward San Antonio (DE-772, p. 338).

Alvarez instructed his cousins –Victor and Acevedo – to tell anyone who might stop them that they were returning from San Antonio. Alvarez attempted to discard everything related to the trip to Dallas. To that end, Acevedo tossed the spare tire key out the window (DE-772, pp. 342-44).

After the stop and the seizure of the $279,000, Victor's parole was revoked and he returned to the Texas Department of Corrections where he served an eight-month term of imprisonment. He thought he was released sometime in 2005. After his release, he went back to work for Alvarez (DE-772, p. 344). During this period, Victor helped load a container, an oxygen tank or cylinder, with cocaine – reported to be Alvarez's new method of shipping contraband (DE-772, p. 345, 388, 393,

---

[5] The government corroborated this testimony with the security video from the South Dallas Home Depot.  The video and receipts from the store were introduced and offered into evidence through the testimony of Mr. Troy McKenzie (DE-772, pp. 176-193).

432). The container was then picked up by a truck bearing the "AOC" logo.  Victor related AOC was a company that delivered compressed gases to work sites and hospitals (DE 772, p. 348). The AOC truck that picked up the cocaine-laden cylinder was almost always accompanied by a Ford Dually that belonged to Eden Flores (DE-772, p. 349-50).[6]

Victor related that Alvarez and his associates often communicated in a type of code. Victor recalled that individuals were assigned certain numbers, contraband was identified with other numbers, and law enforcement agencies were given different numbers (DE-772, pp. 352-55). Alvarez kept this information in a ledger in which he memorialized a variety of transactions (DE-772, p. 362, 396).

### b.   Money in a box and cocaine in duffle bags

In 2006, Drug Enforcement Administration (DEA) Special Agent Julio Alba (DEA SA Alba) portrayed a currency courier in a money laundering investigation (DE-772, p. 267).[7] This investigation originated after Houston DEA discovered a drug trafficking organization operating in the Atlanta, Georgia area (DE-772, p. 280).

---

[6] This testimony is germane to the proof of the charges set forth in Counts One and Six of the Second Superseding Indictment (DE-314).

[7] SA Alba's testimony was corroborated by that of Jose Luis Villareal (DE-822, pp. 2067 *et seq.*

SA Alba was introduced to Jose Luis Villarreal as an individual who could effectively transport more than two million dollars from Atlanta, Georgia back to Texas. SA Alba's introduction to Villarreal took place on January 13, 2006 (DE-772, p. 268; DE-822, p. 2069).[8] Villarreal called SA Alba when he arrived in Atlanta and they agreed to meet at a Waffle House on January 14th (DE-772, p. 269).

Villarreal had arrived in Atlanta without any winter clothing. After the two had become acquainted in the Waffle House, Villarreal asked Alba to take him to a nearby mall where he could buy some cold weather apparel (DE-772, p. 270). During this excursion, Villarreal advised Alba the money was not ready for transport (DE-772, p. 271).

One day later, on the 15th of January 2006, the money was ready. Villarreal and Alba met in the parking of a Dick's Sporting Goods. Here Villarreal gave Alba a large, wide duffle bag and a vacuum cleaner box. Villarreal and Alba transferred the duffle bag and the box from Villarreal's car to Alba's. SA Alba recalled that the box was so full of money the seams were bursting (DE-772, pp. 272-74). The money was

---

[8] Date and testimony germane to proof of allegations set out under Counts Two and Five of the Second Superseding Indictment (DE-314).

wrapped in saran wrap and secured with rubber bands (DE-772, pp.275-76). SA Alba declared that this money was transported to Houston, Texas (DE-772, p.276).[9]

In Houston DEA Special Agent Prentice Coleman arranged to have the money transported to Villarreal, better known to the DEA agents as "Canus," in McAllen, Texas (DE-772, p. 294-95). Immigration and Customs Enforcement (ICE) Special Agent Yolanda Ibarra was given the task of delivering the currency to McAllen (DE-772, p. 309). SA Ibarra and Villarreal rendezvoused at the bar in Logan's Roadhouse Restaurant in McAllen (*Id*; DE-822, p. 2073). SA Ibarra gave Villarreal the keys to the van in which the money had been concealed and watched as Villareal drove it away from the restaurant (DE-772, p. 312, 453; DE-822, p. 2074).

Unbeknownst to Villarreal and his associates the white van in which more than two million dollars had been concealed was under constant surveillance by government agents. One of the agents who assisted in that surveillance was DEA Special Agent Juan Hernandez

---

[9] Houston Police Department (HPD) Sergeant Mark Smith testified that his drug detecting canine alerted on the currency transported to Houston on January 16, 2006 (DE-772, pp. 288-90).

(DE-772, p. 446). SA Hernandez observed the vehicle from an aircraft that circled the mall until Villarreal departed (DE-772, p. 447).

SA Hernandez watched as Villarreal followed a red pickup truck from the parking lot of Logan's Roadhouse. Agents learned that the pickup truck belonged to Reynaldo Oyervides. Oyervides was accompanied by another individual known as "Kilos" (DE-772, p. 448; DE-822, p. 2078). The currency-laden van was followed to a residence located off of West Expressway 83 in Mission, Texas (DE-772, p. 450). Villarreal backed the van up to the residence and parked (*Id.*; DE-822, p. 2075-77). Villarreal remained at the residence for about 15 minutes. After the van was unloaded, Villarreal returned it to Logan's Roadhouse (DE-772, pp. 451-53).

Villarreal remained in Logan's Roadhouse for a few minutes. When he left he got into the red pickup truck and was followed to the Red Lobster in McAllen (DE-772, p. 454). Villarreal and the owner of the red pickup, Oyervides, and "Kilos" walked toward the entrance of the Red Lobster. Oyervides got into a white Avalanche that was registered to Mariano Alvarez (DE-772, p. 455; DE-822, pp. 2078-79). Oyervides remained in the Avalanche briefly; when he got out, SA

28

Hernandez and his compatriots focused on the Avalanche (DE-772, p. 456).

The Avalanche was followed from the Red Lobster to the La Tejana Steakhouse ("the La Tejana"). The driver of the Avalanche got out of the vehicle and entered the bar side of the La Tejana. Flores owned the La Tejana (DE-772, 457).

SA Hernandez testified that the investigators had secured a court order authorizing them to intercept telephone calls made by Eden Flores. The agents also intercepted calls made by Isauro Casas, Alvarez, and Alvarez's brother Felix (DE-772, pp. 459-60). SA Hernandez noted that among the numbers intercepted were those listing Abraham and Guadalupe Hernandez as subscribers (DE-772, p. 464). The telephone intercepts reportedly began in February 2006 (DE-772, p. 465). The information gleaned from the intercepts caused the investigators to initiate surveillance on the residences of Flores and Isauro Casas (DE-772, p. 469).

On February 21, 2006, SA Hernandez observed the arrival of Flores' pickup truck at a residence on which surveillance had been established and the almost simultaneous departure of an AOC

commercial vehicle (DE-772, pp. 475-76). The AOC vehicle was followed to the La Tejana Meat Market Number Two ("Meat Market No. Two") (DE-772, p. 476). SA Hernandez explained that AOC and a company by the name of "Airgas" transported tanks or cylinders to businesses (DE-772, pp. 477-78). During the surveillance of Flores' pickup, SA Hernandez received information that surveillance officers had observed individuals loading duffle bags into a white SUV. Moments later, SA Hernandez saw Flores' pickup truck leaving Isauro Casas' residence followed by a white SUV. The agents conducting surveillance had information leading them to believe that a white truck would be used to convey the contraband (DE-772, pp.480-81; DE-775, p. 1063; DE-821, p. 1596). SA Hernandez asked officers from the Mission Police Department to execute a traffic stop of the white SUV. During the stop the officers found the aforementioned duffle bags. Inside the duffle bags the officers found 217 kilograms of cocaine (DE-772, p. 481; DE-773, p. 496; DE-774, p. 749, 764; DE-822, p. 1598; DE-821, pp. 1822-26).

Flores drove by the site of the stop, looped around and returned to Meat Market Number Two. SA Hernandez remarked that Flores looked in the direction of the traffic stop as he drove past (DE-773, pp. 499,

500; DE-775, p. 1064). At the meat market SA Hernandez saw Alvarez get out of Flores' truck and walk toward a blue-colored Tahoe (DE-773, pp. 500-01).

After Alvarez left the meat market, SA Hernandez returned to the residence on which surveillance had been established earlier. Here, he noted the arrival of Flores, Jr. and Flores in their pickup trucks. In the back of Flores, Jr.'s truck SA Hernandez saw two of the gas tanks or cylinders resembling the one into which Victor Garcia had loaded cocaine (DE-773, pp. 502-03). These tanks were carried to Carla's Beauty Salon ("Carla's"). The investigators secured a search warrant authorizing a search of Carla's. During the execution of the search, the agents found five tanks that had been modified with openings on the bottom (DE-773, pp. 503-04; DE-821, p. 1619-20).

The seizure of 217 kilograms of cocaine on February 21, 2006 was facilitated by the interception of a series of telephone calls on February 20, 2006. The participants in these calls were Casas, Flores, and Alvarez. From these telephone calls, the investigators learned the identity of a heretofore unknown co-conspirator – Marco Antonio Negrete (DE-773, pp. 526-28). The telephone calls recorded on the 21st

of February 2006 were corroborated by observations made by the agents during the stop of Casas' cocaine laden vehicle (DE-773, pp. 527-588).

On February 21st, 2006, DPS Trooper Raymond Munsel executed a stop of a hazardous materials (hazmat) carrier on U.S. Highway 83. The vehicle bore "AOC" logos (DE-815, p. 1366). Trooper Munsel stopped the vehicle for a safety inspection – his authority arose under the regulations of the Federal Motor Carrier Administration (DE-815, pp. 1360, 1367). The inspection report generated by Trooper Munsel on the 21st of February 2006 reflects that the driver of the AOC truck was Marco Antonio Negrete (DE-815, p. 1372). Trooper Munsel declared that he discovered several defects in Negrete's vehicle but confessed that he did not inspect the tanks Negrete was carrying (DE-815, pp. 1373-1374).

### c.    More Title III intercepts

Sometime after the seizure of the cocaine and Casas on February 21, 2006, investigators intercepted a telephone call between Flores and Abraham Hernandez. Flores alerted Abraham to Casas' arrest and the seizure of the cocaine (DE-773, p. 599-600). Flores then asked Abraham

for Negrete's telephone number; they identified Negrete as "El Gordo" (DE-773, p. 601).

In another call to Abraham, Flores explained that he needed to call Negrete to tell him not to call Casas. Flores told Abraham that the investigators had searched Casas' residence as well as Carla's. Flores could not understand why the agents had gone to the beauty salon after searching Casas' residence. Abraham told Flores he could get the number from his brother Guadalupe (DE-773, pp. 602-03). Abraham ultimately got Negrete's telephone number for Flores and Flores called Negrete and told him not to call Casas (DE-773, pp. 604-05; DE-774, p. 881).

Two days later, February 23, 2006, Abraham called Flores. Abraham wanted to know what Flores was going to do after the seizure (DE-773, p. 616). Later Abraham called Flores to tell him that state troopers were "all over the place by Rio Grande City" (DE-773, p. 617). Abraham also told Flores that his brother, Guadalupe, was going to talk to someone about Casas' situation (DE-773, p. 618).

Guadalupe did call Flores. Guadalupe told Flores he would be checking on things for him. According to SA Hernandez, the

conversation between Guadalupe and Flores was coded – neither individual said precisely what they were talking about. SA Hernandez explained that Guadalupe was looking into the state's investigation into Casas (DE-773, p. 622).

In a subsequent call, Flores asked Abraham if they could move contraband with "the browns," meaning United Parcel Service (UPS), as they did with the cylinders or "the cans" (DE-773, p. 623-24). The investigators had been alerted to the use of UPS packages as a means to convey contraband by Negrete (DE-775, p. 1000). On March 7, 2006, Guadalupe and Flores set up a meeting (DE-773, p. 627). In another call, Guadalupe assured Flores that Casas had not said anything about Flores' role in the cocaine seizure (DE-773, p. 630).

In May 2006, Guadalupe approached Justice of the Peace Arnoldo Corpus to see if he could secure a bond for Isauro Casas (DE-822, p.1958). In light of an immigration detainer, the cost of a bond for Casas proved to be too costly for Guadalupe alone. Judge Corpus recalled he met Guadalupe at the La Tejana Steakhouse where they discussed the matter with Flores (DE-822, p. 1961). In the end, Casas' bond was not posted (DE-822, p. 1961).

Guadalupe's efforts in Casas' behalf did not stop with his attempt to secure a bond: on May 11, 2006, Guadalupe delivered $5000 to the law office of Oscar Alvarez (DE-822, pp. 1966, 1970). The money was posted to the account opened for Isauro Casas (DE-822, p. 1970). On May 17, 2006, Guadalupe deposited another $2000 into this account (DE-822, pp. 1970-71).[10]

During the course of the investigation, agents executed a search warrant on Alvarez's residence. During the search, the agents found and seized documents bearing the name of the district attorney and a case number. The documents contained information related to Casas' arrest and the seizure of 217 kilograms of cocaine (DE-774, pp. 708, 821, 941).

After Casas' arrest and the seizure of the cocaine, officers searched Casas' residence. Casas' leased his house from Flores (DE-774, pp. 696, 697, 840). During the search, investigators found and seized an assault rifle, a MAK-90 Sportster (DE-774, p. 698) and several other weapons (DE-774, p. 699, 865).

---

[10] Roy Padilla, a narcotics investigator with the Pharr Police Department, attested to Guadalupe's lengthy experience as a drug trafficker: in 1988, Officer Padilla became acquainted with Guadalupe when Guadalupe recruited him to drive a load of drugs. Officer Padilla was working undercover as a driver (DE-822, pp. 1985-89).

A telephone call between Guadalupe and Flores, intercepted on March 10, 2006, led SA Hernandez to believe that Guadalupe had managed to secure documents related to the investigation that followed Casas' arrest (DE-773, pp. 636-38). Shortly thereafter Guadalupe called Flores. During this conversation, Guadalupe alluded to his brother, Abraham, and told Flores that another individual was willing to help them move contraband through UPS – Guadalupe's manager (DE-773, p. 640). On cross-examination, SA Hernandez identified the individual alluded to as Guadalupe's UPS manager (DE-774, p. 915, 920-23). After his arrest, Guadalupe waived his right to remain silent and confessed that he was involved with a shipment of cocaine via UPS (DE-774, pp. 746-47, 934). According to SA Hernandez, Guadalupe provided UPS labels to be used in shipping packages loaded with cocaine (DE-774, p. 927).

DEA Special Agent Jaime Fernandez participated in the search of Guadalupe's residence (DE-775, p. 1055). During the search the agents found and seized a number of documents from an office Guadalupe maintained in his residence (DE-775, p. 1057). Included among the seized documents were a notice of seizure, an equipment release

agreement, a release of property, and a memorandum drawn up to look like one prepared by the DEA (DE-775, p. 1058-60). Special Agent Fernandez related that narcotics traffickers often secured these types of instruments after a seizure in order to show the owner of the contraband it was seized and not stolen (DE-775, p.1061, 1072). Guadalupe's fingerprints were found on these documents (DE-775, p. 1088-89).

Mission Police Department Officer Hector Mendez assisted in the arrest of Isauro Casas and the seizure of 217 kilograms of cocaine on February 21, 2006 (DE-821, pp. 1598-1602). After Casas' arrest, Officer Mendez gave him and his attorney one of his business cards. After Flores' was arrested, Special Agents Juan Hernandez and Gabriel Valdez presented the card to Officer Mendez – they had found the card during the search that followed Flores' arrest (DE-821, p. 1604). Sometime after the card had been given to Casas, someone had drawn a map to Officer Mendez's residence on it (DE-821, p. 1605).

Officer Mendez reviewed several more documents that were found during the search of Flores' residence. These documents appeared to be official instruments related to the Casas' investigation (DE-821, p.

37

1608). However, Officer Mendez noted that the spelling and the information included in the documents were inconsistent with that Officer Mendez would include in an offense report (DE-821, pp. 1609-10). Flores' and Alvarez's fingerprints were found on these documents (DE-821, pp. 1763, 1765).

A series of telephone calls between Alvarez and Flores on May 15, 2006, ultimately led to the seizure of $35,000 from Flores. According to SA Hernandez, they were following Flores from Rio Grande City back to the McAllen/Mission area. SA Hernandez asked a DPS trooper to execute a traffic stop. When the trooper made the stoop, Flores emphatically told Alvarez not to call him (DE-773, pp. 660-61). This call was made at about 9:07 p.m. (DE-773, p. 661).

Flores called Alvarez at about 11:23 p.m., after he had been released by DPS. Flores told Alvarez he had been pulled over and money had been seized (DE-773, p. 662). Flores had been transporting a bag containing $35,000 in the center console of his dually truck (DE-773, p. 664; DE-822, p. 1938-39). The money in the console was discovered when Mission Police Officer Joe Cruz, a canine handler, arrived at the site of the stop to assist DPS Trooper Davidson, the

officer who had initiated it. Officer Cruz's dog, Darko, alerted on the money concealed in the center console (DE-773, p. 665; DE-774, p. 825; DE-821, pp. 1829-31, 1850-52, 1870).[11]

The next day, May 16, 2006, Alvarez called Flores to find out what Flores had to do to get the money back (DE-773, p. 664). DEA Task Force Officer Ranger Rick Rivera interviewed Flores after the seizure and told him that they could release the money back to him if he could tender proof that the funds were derived from legal endeavors (DE-773, p. 666). After reviewing receipts from Flores' several restaurants, Rivera returned the $35,000 to Flores ostensibly to further the investigation: the investigators feared that Flores would stop using the telephone if he suspected the money was seized as a result of wire intercepts (DE-822, pp. 1946-49).

After the currency was returned to Flores, IRS Special Agent Kathy Vourcos initiated her own investigation into the source of the $35,000 (DE-822, p. 2149). Vourcos' investigation focused on bank records related to accounts for La Tejana Markets One and Two, and the La Tejana Steakhouse (DE-822, p. 2150). Vourcos understood that

---

[11] The seizure of the $35,000 forms the factual basis for the allegations set out under Count Seven of the Second Superseding Indictment (DE-314).

Flores had told the investigators that he had not been able to make his business deposits on the day the $35,000 was seized (DE-822, p. 2152-53). Statements from Texas State Bank revealed that a deposit of $18,000 was made into the La Tejana Meat Market account on May 15, 2006 (DE-822, pp. 2151-52). First National Bank statements revealed two deposits into the La Tejana Steakhouse account on May 15, 2006: one for $778.47 and one for $15,147.02 (DE-822, pp. 2153-54). Statements from the Rio Bank account revealed currency deposits of $11,678 and check deposits of $1,155 were made on May 15, 2006 (DE-822, p. 2155).

SA Vourcos noted that Isauro Casas' bond was reduced to $350,000 on May 10, 2006 (DE-822, p. 2156). SA Vourcos tersely observed this was significant ostensibly because ten percent of $350,000 is $35,000 – the amount found in Flores' console on May 15, 2006 (DE-822, p. 2156).

SA Hernandez related that several intercepted telephone calls between Felix Alvarez, Mariano's brother, and Michael McClelland ultimately led to a traffic stop and the seizure of $413,000 in July 2006 (DE-774, p. 689). Additional calls between Felix and McClelland led to

the discovery of McClelland's associate John Tony of Dallas, Texas (DE-774, p. 690). Calls between Alvarez and an individual identified only as "El Tio" led agents to the identity of a man called "Super," that is, Renaldo Oyervides (DE-774, pp. 690-91).

Investigators searched Abraham's residence on October 25th, 2007. During this search the agents discovered and seized Airgas employee cards indicating that Abraham and Negrete were Airgas employees (DE-774, p. 738; DE-775, p. 983). The agents also found and seized UPS labels (DE-774, p. 739; DE-775, p. 985).

### d.    The testimony of insiders

Hugo Maurice Barrera-Cavazos of Monterrey, Nuevo Leon, Mexico, arranged the transportation of drugs into the United States from Mexico (DE-775, p. 1096-97). Barrera-Cavazos became acquainted with Alvarez in Monterrey, Nuevo Leon, Mexico, sometime in 2000 or 2001 (DE-775, p. 1098). Alvarez worked for an individual named Yahel, or "Jajo," Lopez when he first met Barrera-Cavazos. After Lopez died in 2002, Alvarez succeeded him as the individual who controlled the

passage of drugs from Miguel Aleman, Mexico, into Roma, Texas and the United States (DE-775, pp. 1100, 1105, 1124)[12].

Between 2003 and 2006, Barrera-Cavazos and Alvarez met four or five times in the Red Lobster Restaurant in McAllen, Texas, and in another restaurant owned by a friend of Alvarez (DE-775, p. 1108).

In January 2006, Raul Valladares, a Mexican drug trafficker (DE-775, p. 1096), needed money – his daughter had been hospitalized and he needed cash to pay for her treatment (DE-775, p. 1116). The money Valladares wanted would come from Atlanta (*Id.*). The owner of the money, known to Barrera-Cavazos as "El Palone," had $2,000,000 in Atlanta that needed to be transported to Mexico – Valladares would receive 5% of this cash shipment (DE-775, 1117). Valladares asked Barrera-Cavazos to contact Alvarez so that the money could be brought through McAllen on its way to Laredo where "El Palone" expected it to be delivered (DE-775, p. 1118). Jose Luis Villareal was the individual who Valladares trusted to deliver the money and Villareal was the

---

[12] According to Barrera-Cavazos, the individual identified as "El Tio," during the telephone intercepts was an employee of Jajo Lopez: he moved the drugs to the border in Mexico (DE-775, pp. 1124, 1125).

individual sent to Atlanta to arrange the transport of "El Palone's" money (DE-775, p.1120).

Barrera-Cavazos related that on one occasion he and Alvarez discussed what they called an "accident" – the loss of drug proceeds as a result of a police seizure (DE-775, pp. 1128-29, 1130). It seems Alvarez lost roughly $300,000 of Valladares' money, money that had been collected in Dallas, Texas. Valladares did not believe that the money had been seized because Alvarez had never presented any proof of an official seizure (DE-775, p. 1129).

Reynaldo Oyervides of Monterrey, Nuevo Leon, Mexico, was Hugo Barrera-Cavazos' brother-in-law. Barrera-Cavazos nicknamed Oyervides "Super" (DE-775, p. 1241). Barrera-Cavazos and Raul Valladares employed Oyervides to keep records of "shares" and "purchases" (DE-775, p. 1242). In 2004, Valladares informed Oyervides that the "shares" he was counting were actually kilograms of cocaine (DE-775, p. 1243; DE-815, p. 1305). During his employment, Oyervides was often dispatched to meetings with Alvarez to check on the status of some cocaine accounts. Oyervides recalled that his meetings with Alvarez often took place in parking lots (DE-775, p. 1244).

43

On January 18th, 2006, Oyervides met with Jose Luis Villareal to tell him where to deliver the money (DE-775, p. 1245).  Oyervides was to meet Villareal at Logan's Restaurant located on Highway 83. Oyervides arrived at the meeting in a red pickup truck (DE-775, p. 1246). After leading Villareal to the site of the money exchange, Oyervides returned to the Red Lobster in McAllen where he got into Alvarez' Avalanche to meet with Alvarez (DE-815, p. 1268). On cross, Oyervides suggested that he and Alvarez discussed the purchase of tickets for a concert Oyervides wanted to attend (DE-815, p. 1341).

Oyervides related that his records reflected Alvarez's involvement in at least two transactions: one in 2005 and one in 2006. In 2005, Alvarez's efforts netted him approximately $300,000; in 2006, Alvarez reportedly earned about $90,000 for his work with Barrera-Cavazos and Villadares (DE-815, pp1353-54).

Marco Antonio Negrete was a truck driver who resided in Pharr, Texas (DE-815, p. 1402). Negrete worked for three welding companies: Matheson Tri-Gas, the Air Gas, and AOC. Negrete delivered welding supplies including gas tanks used by welders (DE-815, p. 1403, 1568). In 1996, Negrete became acquainted with Abraham Hernandez when

they both worked for Airgas. About two years later, Negrete became acquainted with Abraham's brother, Guadalupe, and Eden Flores, Sr. (DE-815, pp. 1404-05). Negrete and Abraham enjoyed a friendly relationship (DE-815, p. 1406, 1567). They socialized at the La Tejana Steak House and occasionally had lunch at the La Tejana Meat Market. Negrete recalled that Flores owned both the steak house and the meat market. Another individual Negrete met at this time was Isauro Casas; Casas worked for Flores (DE-815, p. 1408).

Negrete recalled that Guadalupe called him and asked him to drop off packages at the UPS box-drop on Military Drive. These packages contained either cocaine or marijuana. Guadalupe needed Negrete to drop the packages off because the UPS driver knew Guadalupe. Negrete reported being paid between $300 and $400 for dropping the packages off (DE-815, p. 1411).

Later, Abraham told Negrete that Flores was interested in transporting the drugs in the gas "bottles" or cylinders that he transported for AOC – they wanted to transport these bottles between Roma and Palm View (DE-815, p. 1414, 1516-17). The bottoms of the bottles were hollowed out and the bottom piece was replaced with a

45

removable cover. Abraham got the bottles from one of his customers, Orchid International (DE-815, p. 1415, 1571-73). Abraham and Negrete picked the bottles up in McAllen and carried them to the La Tejana Meat Market on La Homa Road (DE-815, p. 1416).

Negrete picked the tanks up from two locations in Roma and took them to Casas' house in Palm View, Texas. Flores reportedly led him to Casas' Palm View residence (DE-815, p. 1422). Negrete recalled that the last time he delivered "bottles" to Casas was on February 21, 2006 – he remembered the day because he "happened to look at the papers" (DE-815, p. 1423). Negrete was nervous during the stop by Trooper Munsel because of the cocaine in the "bottles" he was carrying (DE-815, p. 1427). After the stop, Casas called him and told him to leave the bottles on his carport in front of his house (DE-815, p. 1427).

Later on the 21st of February 2006, Abraham called Negrete and told him that Flores wanted to talk to him. Flores did, in fact, call Negrete (DE-815, p. 1428). During his call with Flores, which had been intercepted and was played for the jury, Flores instructed Negrete to say nothing about the "bottles" if anyone asked about them (DE-815, p. 1429). Flores also instructed him not to call Casas (DE-815, p. 1430).

46

In another conversation with Abraham, Negrete learned that Flores wanted a woman mystic "to do a sweep of the houses," that is, he wanted her to draw away "evil spirits" (DE-815, p. 1433). Negrete did not allow the woman to do a sweep of his house; Abraham, Guadalupe, and Flores apparently did (*Id*).

Negrete continued to engage in drug trafficking activities with Guadalupe, Flores, and his friend, Abraham after Casas' arrest in February 2006. When asked how he knew that Flores was involved, Negrete explained that he picked up the drug-laden UPS packages at either the La Tejana Steak House or the Meat Market (DE-815, p. 1434). Abraham waited for Negrete beside a door in front of the Meat Market; here, he gave him the package to be dropped off at the UPS drop box. The packages were destined for Lubbock, Dallas, and California (DE-815, p. 1435, 1505). Abraham told Negrete that the packages contained cocaine (DE-815, p. 1436).

Negrete confessed he and Guadalupe caused Flores some discomfiture with the last package they sent. Before this package was sent, Guadalupe and Negrete contemplated "stealing the box, the cocaine," so they could make some money for themselves (DE-815, p.

1437-38). Guadalupe asked Negrete if he would like to steal the cocaine and send the box, which was supposed to go to Lubbock, to California. Guadalupe and Negrete secured a box similar to the one loaded with cocaine; filled it was newspapers and sent it to Lubbock. They replaced the label on the box loaded with contraband and sent it to California (DE-815, pp. 1438-39). After the newspaper-filled box arrived in Lubbock, Abraham called Negrete to tell him that Flores was a bit miffed (DE-815, p. 1440).

Before he played a role in transporting contraband, Negrete picked up money for the drug traffickers. He thought it was sometime in 2005 when he was working for Matheson Tri-Gas (DE-815, p. 1441). Abraham called Negrete and told him that Flores wanted him to go to Dallas to pick up money (DE-815, p. 1442). Negrete was under the impression that he would draw less attention from the constabulary if he used the "Matheson Tri-Gas" company truck (DE-815, p. 1443).

Abraham gave Negrete $1000 to cover expenses before he departed for Dallas. He reportedly spent one day in a hotel located on the frontage road to IH-20.  Negrete remained in Dallas until 4 or 5 in

the afternoon during which time he remained in almost constant contact with Abraham (DE-815, p. 1444).

In Dallas, Negrete picked up welding boxes. Abraham told him that these boxes were loaded with currency (DE-815, p. 1447). When he returned to McAllen, he took the boxes to Flores at the La Tejana Steak House. Abraham paid Negrete for his effort (DE-815, p. 1448). He reportedly received between $1600 and $1900 (DE-815, p. 1450).

Anwar Deluna was introduced to Flores, Jr. by a cousin. Deluna and a friend of his, Eduardo Guerra, purchased one kilogram of cocaine from Flores, Jr. (DE-822, pp. 1994-95). Flores, Jr., Deluna, and Guerra discussed this purchase at the La Tejana Steakhouse. Flores Jr. secured the cocaine from his father, Flores (DE-822, p. 1996). Deluna received the cocaine during a meeting that took place in the vicinity of the La Tejana Meat Market on La Houma Road. Deluna was conveyed to the meeting by Guerra. Casas delivered the cocaine; he took one kilogram from his car and gave it to Deluna who gave it to Guerra (DE-822, pp. 1997-98). Satisfied with the quality of the kilogram, Guerra gave Deluna $11,500: Deluna kept $200 and gave the balance to Flores Jr.

The parties then went their separate ways; Flores, Jr. and Deluna went to get something to eat (DE-822, p. 1999).[13]

Moments later, Guerra called Deluna to tell him he had been "intercepted" by a state trooper on the Expressway and La Homa Road. Guerra reported that he had taken the officer on a high speed chase to San Juan, Texas (DE-822, pp. 1999-2000). Flores, Jr. was nonplussed by the report of Guerra's encounter with the state trooper – he assumed it was due to the fact that Guerra's vehicle bore temporary license tags (DE-822, p. 2000).

Guerra told Deluna that he had tossed the kilogram of cocaine and abandoned the vehicle in the "San Juan Projects."  Flores, Jr. reacted to this news by telling Deluna that he had to retrieve a knife that had been left in Guerra's abandoned conveyance – it belonged to Flores (DE-822, p. 2001).[14]

---

[13] Unbeknownst to Deluna, Guerra, Casas, and Flores, Jr. this meeting did not go unnoticed by the authorities.  Among the officers summoned to observe the meeting was Drug Enforcement Special Agent Francisco F. Garza.  Garza related that the meeting took place on Saturday, November 19, 2005 (DE-822, p. 2035).

[14] DEA Special Agent Garza related that the pursuit of one of the vehicles observed leaving the meeting was thwarted by the weather: the trooper who pursued it lost it in the rain.  After the abandoned vehicle was located, the officers backtracked to where the vehicle was lost and found a Target bag containing one kilogram of cocaine.  Inside the abandoned conveyance, the officers found a knife that had some cocaine residue on it (DE-822, pp. 2038-44).

Despite Guerra's loss of the kilogram of cocaine, Guerra continued to do business with Deluna and Flores, Jr. In an attempt to recoup the losses resulting from the loss of the abandoned kilogram, Flores, Jr., Deluna, Casas, and Guerra met in San Juan, Texas, to close a ten-kilogram deal (DE-822, pp. 2001-2). The group from Tennessee who were interested in the ten kilograms was not in San Juan, however. After a brief discussion, Flores, Jr. and Casas decided that Deluna and Guerra could drive the load of cocaine hidden in Casas' truck to Mercedes, Texas, where the purchasers were reportedly waiting (DE-822, pp. 2003-4). The deal was closed in a house in Mercedes. Deluna received the cash payment for the contraband. He took his $1000 cut and gave the remainder to Flores, Jr. (DE-822, pp. 2006-7).

### e. The defective trailer lamp and a truck load of cash

On July 13, 2006, DPS Trooper Gina Stone executed a traffic stop of a tractor trailer outside of Dallas in Hunt County, Texas (DE-822, p. 2051-52). Trooper Stone related that the truck had a defective clearance lamp. Stone showed the driver the defective lamp; the driver told her he had been having trouble with that lamp (DE-822, p. 2054).

Trooper Stone learned that the driver of the truck, Michael McClelland, was coming from Arkansas where he had tried to sell the vehicle. The deal fell through, however, so he was driving it back to Dallas. Trooper Stone learned that the truck was registered to McClelland's wife. She also discovered that he did not have a logbook (DE-822, p. 2055). McClelland's failure to produce a logbook and a single state registration caused Trooper Stone to put both the driver and the vehicle out of service. Trooper Stone then ran a check of the driver's license – it was suspended. Because driving with a suspended license was a Class B misdemeanor, Trooper Stone arrested McClelland (DE-822, p. 2057).

After arresting McClelland, Trooper Stone had the tractor towed off of the Interstate to Petty's Wrecker Service in Hunt County, Texas, where she conducted a level three inspection (DE-822, p. 2058). Trooper Stone entered the tractor cabin to complete the inspection. In the cabin she came upon a partially unzipped bag filled with money. Stone suspended the inspection and called her sergeant (DE-822, p. 2058-59).

Trooper Stone's sergeant instructed her to remove the bag of money from the truck and place it in her patrol car. Stone removed the

money, placed it in the car, and turned on her video (DE-822, p. 2059). Shortly thereafter DPS narcotics officers arrived with money counters – the bag contained $413,184 (DE-822, pp. 2061-62).

John Toney testified that Michael McClellan was a courier for himself and one Felipe Alvarez. Toney operated a drug trafficking venture in the Dallas, Texas area; Felipe Alvarez supplied drugs for Toney's organization. McClellan ferried drugs for Felipe Alvarez and money for Toney (DE-822, pp. 2095, 2098-99). On July 13, 2006, McClellan was conveying the proceeds from marijuana sales back to Toney in Dallas. The $413,184 seized by Trooper Stone during her stop and inspection of McClellan's truck represented the proceeds from the sale of 1800 pounds of marijuana (DE-822, p. 2101). Although he was not the registered owner of the truck McClellan drove, Toney had in fact purchased it (DE-822, pp. 2101-02). Sometime in the summer of 2005, Toney became acquainted with Mariano Alvarez – Toney did not know whether or not Alvarez had anything to do with the $413,184 that was seized on July 13, 2006 (DE-822, p. 2106, 2119).

Francisco Javier Longoria worked with Guadalupe Hernandez from sometime in 2000 to 2004 (DE-822, p. 2127). Longoria and

Guadalupe worked for an individual by the name of Mario Sanchez. Longoria was responsible for transporting Sanchez's drugs; Guadalupe was responsible for transporting Sanchez's drugs through UPS (DE-822, p. 2127). Longoria related that he saw Guadalupe around drugs when the organization was buying "cheap drugs" (DE-822, p. 2128). Sanchez reportedly employed Guadalupe because he had worked for UPS. Guadalupe assisted in the preparation of boxes that would contain up to 10 kilograms of contraband (DE-822, p. 2129).

### f. Evidence closes, post-trial maneuvers, and the jury's verdict

After nine days of trial, on July 20, 2009, the government rested (DE-874, p. 4). Thereafter the district judge overruled the defendants' motions for judgment of acquittal (DE-874, pp. 4-18). Upon denying the motions for judgment of acquittal, the court conducted a charge conference during which the judge entertained, and ruled on, any objections to the jury instructions (DE-874, pp. 18-24).

Before the case was submitted to the jury, Abraham called Special Agent Juan Hernandez to testify (DE-874, p. 29). Abraham questioned Hernandez's ability to recognize his voice on the wire intercepts (DE-874, pp.30-31). Abraham pointedly noted that SA Hernandez had

testified at an earlier proceeding that he had not personally heard him until he was arrested (DE-874, p. 34).

Abraham finished his examination of SA Hernandez by asking him if Negrete had told him that Abraham was the individual who had asked him to secure the Airgas "cylinder" or "bottles" (DE-874, p. 40). Flores initiated his examination of SA Hernandez with reference to Negrete's debriefings (DE-874, p. 41). Flores stressed the fact that Isauro Casas, not Flores, instructed Negrete on what he had to do (DE-874, pp.42-43).

The defendants rested after SA Hernandez testified (DE-874, pp. 46-47). The district judge submitted his charge to the jury (DE-874, pp. 49-76). Thereafter the parties presented their closing arguments (DE-874, pp. 76-168). The district court submitted the final instructions and the jury retired to deliberate (DE-874, pp. 169-172).

During their deliberations, the jury filed several jury notes including a request to hear several of the wire intercepts (DE-874, p. 182; DE-875, p. 3-9). After approximately eight hours of deliberation (DE-874, pp. 173-182; DE-875, pp. 1-30), the jury returned its verdict: Alvarez was found guilty of counts one, two, three, five, and six, and not

guilty of counts seven and eight (DE-875, p. 32). Flores was found guilty as to counts one and six and not guilty as to count seven. Guadalupe and Abraham were found guilty of the charges alleged in counts one and six (DE-875, pp. 32, 33).

## IV.

## MOTION FOR SUMMARY JUDGMENT AND AUTHORITIES

### A.    Ineffective assistance of counsel generally

It is well settled that ineffective assistance of counsel complaints are analyzed under the rule promulgated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). This analysis proceeds in two steps: (1) the court determines whether counsel's performance fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (citing *Padilla v. Kentucky*, 559 U.S. 356, 355 (2010) (quoting *Strickland*, at 688, 694)); *Woods v. Donald*, _ U.S. _, 134 S. Ct. 1372, 1375 (2015); *United States v. Bernard*, 762 F3d 467, 471 (5th Cir. 2014).

The first prong in the analysis, constitutional deficiency, is

necessarily linked to the practices and expectations of the legal community. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Hinton*, 134 S. Ct. 1088 (quoting *Padilla*, 559 U.S. at 366 and *Strickland*, 466 U.S. at 688). In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances. *Id.* (quoting *Strickland* 466 U.S. at 688). "Under *Strickland*, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Hinton*, at 1088. An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance. 134 S. Ct. at 1089. Counsel's performance is strongly presumed to fall within the wide range of

reasonable professional assistance. Counsel's performance is evaluated in light of all the circumstances existing at the time of counsel's conduct. *Bernard*, 762 F.3d at 471.

The second prong of the ineffectiveness analysis entails a demonstration "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. … When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Hinton*, at 1089 (quoting *Strickland*, at 694, 695). Stated otherwise, to establish prejudice, the defendant must show "that his attorney's errors were so serious that they rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Bernard*, 762 F.3d at 471.

In *Bernard*, the Fifth Circuit, quoting *Harington v. Richter*, 562 U.S. 86, _, 131 S. Ct. 770, 790 (2011), observed:

> Although courts may not indulge "*post hoc* rationalization" for counsel's decision making that contradicts the available evidence of counsel's actions, … neither may they insist counsel confirm every aspect of the strategic basis for his or

her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others, reflects trial tactics rather than "sheer neglect." ... After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance not counsel's subjective state of mind.

*Bernard*, 762 F.3d at 471-72.

Alvarez's contention that his attorney's failure to negotiate a plea agreement after the declaration of a mistrial was unreasonable implicates the Supreme Court's holdings in *Lafler v. Cooper* and *Missouri v. Frye*. In *Missouri v. Frye*, _ U.S. _, 132 S. Ct. 1399 (2012), the Court addressed two interrelated issues: (1) whether the constitutional right to counsel extends to the negotiation and consideration of plea offers that lapse or are rejected; and (2) if there is a constitutional right with respect to those offers, what must a defendant demonstrate in order to show that prejudice resulted from counsel's deficient performance. *Frye*, 132 S. Ct. at 1404. In resolving these issues, the Court initially held that "criminal defendants require effective counsel during plea negotiations. 'Anything less ... might deny

a defendant effective representation at the only stage when legal aid and advice would help him.'" *Id.*, 132 S. Ct. at 1407-1408.

The Court further held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 132 S. Ct. at 1408. The Court suggested three measures for the courts to employ to ensure that defense counsel fulfilled his or her obligation to communicate formal offers from the prosecution to the defendant:

> First, the fact of a formal offer means that its terms and its processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations. Second, States may elect to follow rules that all offers must be in writing, again to ensure against later misunderstandings or fabricated charges. See N. J. Ct. Rule 3:9-1(b) (2012) ("Any plea offer to be made by the prosecutor shall be in writing and forwarded to the defendant's attorney"). Third, formal offers can be made part of the record at any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has been fully advised before those further proceedings commence.

132 S. Ct. at 1409.

To show prejudice in the plea negotiating context, a defendant "must demonstrate a reasonable probability that [he] would have

accepted the earlier plea offer had [he] been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or sentence of less prison time." *Frye*, 132 S. Ct. at 1409. In *Frye*, the Court concluded that counsel's performance was deficient because counsel failed to advise Frye of an early plea offer that included terms more favorable than the terms Frye ultimately accepted. The case was remanded to the Missouri Court of Appeals to see if Frye could have and would have accepted the terms of the earlier offer. 132 S. Ct. at 1411.

In *Lafler v. Cooper*, _ U.S. _, 132 S. Ct. 1376 (2012), the defendant declined a plea offer and proceeded to trial. Upon being found guilty, the defendant received a harsher sentence than the one offered under the terms of a rejected plea bargain. The case came to the Supreme Court with the concession that counsel's advice to reject the plea

agreement was deficient, that is, it "fell below the standard of adequate assistance of counsel guaranteed by the Sixth Amendment…" *Lafler*, 132 S. C. at 1383. The question before the Court in *Lafler* was "how to apply *Strickland*'s prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted in the ensuing trial." *Id*., 132 S. Ct. at 1384.

The Court predicated its analysis on the proposition that "Sixth Amendment remedies should be 'tailored to the injury suffered from the constitutional violation and should not necessarily infringe on competing interests.'" *Lafler*, 132 S. Ct. at 1388 (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)). The Court explained that the remedy "must neutralize the taint of a constitutional violation … while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State invested in the criminal prosecution." *Id*, 132 S. Ct. at 1389. In the case of a defendant who declined a plea bargain as a result of infirm advice, the ensuing injury may take one of two forms: (1) a harsher sentence or (2) conviction of more counts and more serious counts. 132 S. Ct. at 1389. The Court concluded that if the defendant satisfies his burden of showing deficient

performance and prejudice as required by *Strickland*, the trial court may resentence the defendant consistent with the provisions of the tendered plea bargain consistent with the defendant's expressed willingness to accept responsibility for the offense or may order the government to tender the original plea bargain. *Lafler*, 132 S. Ct. at 1390-1391.

To show prejudice in the sentencing context, a petitioner must show "a reasonable probability that but for trial counsel's errors his non-capital sentence would have been significantly less harsh." *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994) (citing *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993)). Under this standard, the court must consider such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances. *Id.*

In *Glover v. United States*, 531 U.S. 198, 121 S.Ct. 696 (2001), the Court put a somewhat different gloss on the notion of ineffective assistance of counsel at sentencing when it held that any increase in a

sentence stemming from an error that would have been correctable on appeal establishes the prejudice prong of *Strickland*. 531 U.S. 198, 121 S.Ct. at 700-01. *Glover* turns largely on an attorney's failure to object to an error of law that affects the calculation of a sentence. Such a failure results in prejudice if the alleged error was correctable. 531 U.S. 198, 121 S.Ct. at 700. The Court remanded the case for an assessment of the reasonableness of counsel's performance.

After *Glover*, the Fifth Circuit modified the "significantly less harsh test" prescribed by *Spriggs v. Collins*, *supra*. In *United States v. Grammas*, 376 F.3d 433 (5th Cir. 2004), the Court held that *Glover* abrogated the "significantly less harsh test" and replaced it with an "any actual amount of jail time" test.  Stated otherwise, the prejudice prong of the *Strickland* standard is satisfied if the petitioner shows that counsel's deficient performance resulted in any amount of prison time above that the petitioner would have received if the forfeited complaint had been advanced at trial or on appeal. 376 F. 3d at 438, 439. The Court pointedly noted that the new test applied to the then mandatory federal guideline regime. *Grammas*, at 438 n. 4. Since *Grammas*, the mandatory federal sentencing guideline regime has been held to be

unconstitutional and federal sentences under an advisory guideline scheme are tested for "reasonableness."

**B.**   **Failure to adequately object to order of mistrial**

In his first ground for relief, Alvarez contends that his attorney's failure to lodge an adequate objection to the Court's decision to order a mistrial constitutes deficient and unreasonable professional performance. Alvarez reasons that this failure resulted in the abrogation of his right to be free from double jeopardy. Alvarez finds support for this conclusion in the holding of the court of appeals rejecting his complaint that the second trial constituted a violation of his right to be free from double jeopardy. Alvarez based the issue raised on appeal on this Court's denial of his motion to dismiss the indictment filed before the start of the trial in Houston. The court of appeals observed:

> Alvarez did not explicitly object to the mistrial or provide the district court with notice and opportunity to address the double jeopardy concerns he now raises on appeal. "A prior expression of a desire to continue the trial will not save a defendant from the implied consent doctrine," including a defendant's expressed desire to proceed to a verdict prior to the district court's declaration of a mistrial. *Palmer*, 122 F.3d at 219; *see also United States v. Benjamin*, 129 Fed. Appx. 887, 889 (5th Cir. 2005) (finding defendant impliedly consented to mistrial when he "did not

contemporaneously object" to the district court's declaration of a mistrial, but rather filed a " 'motion to bar retrial on grounds of double jeopardy' nearly two weeks after the trial court declared a mistrial"). "We must insist upon express objections." *Palmer*, 122 F.3d at 219.[15] Alvarez indicated to the court the he would like to proceed to a verdict, but this is distinct from raising a double jeopardy concern before the district court. Indeed, after the district court declared a mistrial, Alvarez suggested a retrial in a venue other than Houston rather than objecting to the mistrial. *See Nichols*, 977 F.2d at 974 (finding implied consent to mistrial despite defendant's expression of displeasure at possibly retrying the case because defendant did not make an express objection and "implied his consent to the retrial by failing to object to the mistrial and by rescheduling the new trial").[16] As such, he impliedly consented to the mistrial and double jeopardy does not bar his retrial. *See El-Mezain* 664 F.3d at 559[17]; *Palmer*, 122 F.3d at 218. The district court did not err in denying Alvarez's motion to dismiss the indictment.

*Alvarez, et al*, 561 Fed. Appx. at 380.

Alvarez's contention implicates the first prong of the *Strickland* analysis – the reasonableness of counsel's decision to move for dismissal of the indictment as opposed to objecting to the grant of the mistrial. In light of the circumstances surrounding the Court's decision to grant a mistrial, counsel's decision may have been flawed in retrospect but was

---

[15] *United States v. Palmer*, 122 F.3d 215 (5th Cir. 1997).

[16] *United States v. Nichols*, 977 F.2d 972 (5th Cir. 1992).

[17] *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011).

reasonable prospectively because the record fully supports the Court's exercise of its discretion to grant a mistrial.

The evidence in the first trial of Case No. 7:07-CR-144 S2, conducted in the McAllen Division of the Southern District of Texas, closed on November 24 2008 (DE-390). The jury deliberated from November 24, 2008 to December 5, 2008.  During their deliberations, the jury filed 27 jury notes (DE-443). In the 27th note, the jury foreperson advised the judge that Juror No. 6 had initiated his own investigation into a matter that was to be resolved by the jury. The district judge discussed the issue with the foreperson, met with the attorneys, and examined Juror No. 6. On December 8, 2008, the ninth day of jury deliberations, the judge declared a mistrial. The court cited the jury's inability to reach a verdict over two weeks of deliberations and the very real probability that the dismissed juror had adversely affected the jury's deliberations (DE-705, p. 2702). On appeal, Alvarez complained that the district judge abused its discretion when it declared a mistrial and thereafter violated his right to be free from double jeopardy when he was convicted of the charges by a jury sitting in the Houston Division of the Southern District of Texas.

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.' U.S. Const., Amdt. 5. The Clause 'guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'" *Blueford v. Arkansas*, 132 S. Ct. 2044, 2050 (2012) (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977)). Jeopardy does not bar the retrial of a defendant following the discharge of a deadlocked jury even if the discharge occurs without the defendant's consent. *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1861 (2010) (citing *United States v. Peretz*, 9 Wheat. 579, 6 L. Ed. 165 (1824)).

Trial judges may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity" for doing so. The decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico*, at 1863. A mistrial is appropriate when there is

68

a "high degree" of necessity. A trial judge's decision to declare a mistrial when the court considers the jury deadlocked is accorded great deference by a reviewing court. *Id.*

In *Renico*, the Court observes:

> The reasons for "allowing the trial judge to exercise broad discretion" are "especially compelling" in cases involving a potentially deadlocked jury. *[Arizona v.] Washington*, 434 U.S. [497] at 509 [(1978)]. There, the justification for deference is that the "trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.* at 510, n. 28. In the absence of such deference, trial judges might otherwise "employ coercive means to break the apparent deadlock," thereby creating a "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Id.* at 510.

130 S. Ct. at 1863. This is not to say that trial judges are granted *absolute* deference in this context. The judge's exercise of discretion must be sound. "If the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Id.*

Trial judges are not bound by any "mechanical application of any rigid formula" when deciding whether jury deadlock warrants a mistrial. *Renico*, at 1863 (citing *Wade v. Hunter*, 336 U.S. 684, 691

(1949)). Moreover, a trial judge declaring a mistrial is not required to make explicit findings of "manifest necessity" or to "articulate on the record all the factors which informed the deliberate exercise of his discretion." *Id.* at 1864. Nor has the Supreme Court ever required a trial judge "to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse." *Id.*; *see also*, *Blueford*, 132 S. Ct. at 2052; *see also United States v. Hoeffner*, 626 F.3d 857, 867 (5th Cir. 2010).

Notwithstanding Alvarez's contention to the contrary, the Court did not abuse its discretion when it declared a mistrial. Alvarez contends that the jury had only been deliberating seven days and its notes reflected attention to detail, not confusion. Alvarez asserts that the misconduct of juror Number 6 was insignificant in light of the overwhelming evidence adduced by the government against the defendants. The judge found that the length of the deliberations and the number of notes submitted by the jury reflected confusion. Indeed, in two of the notes, the jury doubted its ability to come to a unanimous

verdict (Alvarez Br. on Appeal, pp. 23, 26). Significantly, the district judge intuited that Juror Number 6's influence on the jury went beyond a mere investigation into one's ability to secure UPS labels. The judge's intuition was later corroborated by an FBI investigation into the conduct of Juror No. 6: the investigation led to the discovery that two of Alvarez's co-defendants, Guadalupe and Abraham Hernandez were discussing the case with him during the course of the trial (Guadalupe Hernandez PSR ¶ 107; DE-753, p. 2949-50). Moreover, before the start of the retrial, the district judge was reminded of the fact that Guadalupe also had made approaches to female jury members (DE-753, p. 2951). The Court did not abuse its discretion when it ordered the mistrial of the case in McAllen. Alvarez's right to the effective assistance of counsel was not abrogated as a result of his attorney's decision to move for dismissal of the indictment as opposed to lodging an objection to the grant of a mistrial – counsel could reasonably conclude that Court's exercise of its discretion was sound under the circumstances. Moreover, Alvarez cannot show that he was prejudiced by his attorney's decision to move for dismissal: the conduct of the Hernandez brothers and Juror 6 supports the Court's exercise of its

discretion to order a mistrial. Relief on this ground must be denied.

## C. __Failure to move for recusal or lodge some sort of objection to the transfer order__

Alvarez asserts that his attorney's efforts in his behalf should be deemed deficient and unreasonable in light of his failure to secure some relief from the order of transfer. On appeal, the Fifth Circuit held that the Court did not abuse its discretion when it ordered the case transferred to the Houston Division of the Southern District of Texas. *Alvarez, et al.*, 561 Fed. Appx. at 380-82. With respect to counsel's failure to seek disqualification of the Court, Alvarez has wholly failed to allege and show any grounds justifying recusal.

Rule 18 of the Federal Rules of Criminal Procedure provides:

> Unless a statute or these rules provide otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

FED. R. CRIM. P. 18. All questions concerning venue are reviewed under the abuse of discretion standard. *United States v. Lipscomb*, 299 F.3d 303, 339 (5th Cir. 2002). The *Lipscomb* Court explained:

> In general [a] district court by definition abuses its discretion when it makes an error law. A district court also

abuses its discretion if it "bases its decision … on a clearly erroneous assessment of the evidence." As a leading treatise on standards of review suggests, a trial court abuses its discretion "when the judge has considered the wrong factors in applying his discretion (the judgment call was made as to issues or factors not within the scope of his discretionary powers)."

*Lipscomb*, at 338-39.

Reversal of an intradistrict transfer is proper only if a party demonstrates a "substantial ground to overturning the district court's decision." 299 F.3d at 339. The district court's exercise of discretion resulting "in a trial in an environment alien to the accused over a proper objection must be supported by a demonstration in the record that the judge gave due regard to factors now incorporated in Rule 18." *United States v. Garza*, 593 F.3d 385, 390 (5th Cir. 2010). The propriety of an intradistrict transfer ultimately turns upon a balancing of the convenience to the defendants against the prompt administration of justice. In assessing convenience, this Court considers (1) the distance from the defendant's home, (2) the location of the defendant's witnesses, and (3) the ability of the defendant's family and friends to attend the trial.  The Court has noted "that the burden on a defendant increases

when a transfer forces the defendant's counsel to try a case far from his or her practice." *Id*.

In *Garza*, the Court notes that the "second textual factor – due regard to the prompt administration of justice – is in part a literal command that trials comply with the Speedy Trial Act. … Courts must weigh the impact the trial location will have on the timely disposition of the instant case." 593 F.3d at 390. Citing *Lipscomb* and *Garza*, Alvarez renews his citation to the inconvenience to him and his counsel to support his contention that he was prejudiced by the Court's order to transfer the case from McAllen to Houston. The district judge's remarks to the jury implicate its concern with a circumstance that was not clearly evident in either *Lipscomb* or *Garza* - the prompt and effective administration of justice.

The decision to transfer the case was clearly precipitated by the misconduct of Juror Number 6.  Moreover, the record reflects that this misconduct arose as a result of Guadalupe and Abraham's influence on that juror. The discussions between Guadalupe, Abraham, and Juror Number 6 effectively impeded the administration of justice in the McAllen Division. The court's remarks in granting the mistrial and in

dismissing the jury indicated its concern that Juror Number 6's misconduct infected the jury's deliberations (DE-705, pp. 2701, 2704) and similar misconduct could best be prevented by transferring the case away from McAllen (DE-705, p. 2705). Moreover, transfer of the case to Houston would insure the prompt administration of justice by virtue of the fact that more courtrooms and jurors would be available in Houston as opposed to Corpus Christi. The case is thus analogous to *In re Ford*, 987 F.2d 334 (6th Cir. 1992), in which the Sixth Circuit upheld an intradistrict transfer based on evidence of juror misconduct, improper juror contact, and attempts to influence the jury. 987 F.2d at 338, 341-42. Alvarez cannot show that his right to the effective assistance of counsel was abrogated as a result of the transfer of the case to Houston.

Alvarez's counsel's decision not to pursue a motion to disqualify the Court must be deemed reasonable. A federal judge shall disqualify himself from a proceeding if his "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The purpose of this provision is to "promote public confidence in the integrity of the judicial process . . . with an objective test." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859 (1988). The judge need not know of the "facts creating

an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Id.* at 860. "[E]ach § 455(a) case is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995).

"[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). In addition, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

The Fifth Circuit "has recognized that a timeliness requirement applies to raising § 455(a) disqualification." *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994). "Furthermore, it is well-settled that – for obvious reasons – one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Id.* Here,

counsel had not reason to question the Court's impartiality. The decision not to seek recusal was sound. Relief on this ground must be denied.

## D.   <u>Failure to negotiate a guilty plea</u>

Alvarez contends that his attorney abrogated his right to the effective assistance of counsel by failing to actively negotiate a plea agreement with the government after the Court declared a mistrial and before the trial in Houston began. Alvarez suggests that he would have received a lower term of imprisonment if his attorney had advised him that he could plead guilty without agreeing to cooperate with the government in the prosecution and investigation of the offense. According to Alvarez, his attorney exacerbated the deficiency by advising him that he would be subject to a life term of imprisonment if he pleaded guilty without an attendant promise to assist the government.

Alvarez supports this contention with an affidavit in which he declares that after the Court declared a mistrial, he "wanted to enter into a plea bargain with the government." Alvarez claims that he did not communicate with his attorney from the date of the mistrial in

McAllen until the commencement of the second trial in Houston. Alvarez explains that his attorney "would no longer represent me until he received more money from my family for the second trial." Alvarez's Affidavit concludes with the suggestion that Alvarez would have entered a guilty plea to all of the charges in the indictment before the first trial had his attorney advised him that he would have been subject to an imprisonment range of between 324 and 405 months as opposed to the life term his attorney had estimated.

In *Missouri v. Frye*, *supra*, the Supreme Court held that criminal defendants require effective counsel during plea negotiations. The Court explained that anything less would effectively deny a defendant effective representation at the only stage when legal aid and advice would help him. Generally, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. To show prejudice in the plea negotiating context, a defendant must demonstrate a reasonable probability that [he] would have accepted the earlier plea offer had he been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have

been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or sentence of less prison time. *Frye*, 132 S. Ct. at 1409. In *Frye*, the Court concluded that counsel's performance was deficient because counsel failed to advise Frye of an early plea offer that included terms more favorable than the terms Frye ultimately accepted.

*Frye* and its companion case, *Lafler*, are predicated on the proposition that a criminal defendant's attorney failed to communicate a proposed plea agreement to the defendant or misled the defendant with respect to the benefits of accepting a proposed plea agreement. Here, the record reflects that the government afforded the several defendants opportunities to plead guilty: five (5) of the nine (9) defendants charged in the Superseding Indictment availed themselves of the government's offers and pleaded guilty: Eden Flores, Jr. (PSR ¶ 15); Marco Negrete (PSR ¶ 16), Anwar DeLuna (PSR ¶ 19), Eduard Guerra (PSR ¶ 20) and Jose Villareal (PSR ¶ 22). Alvarez, Eden Flores,

Sr., Guadalupe and Abraham Hernandez did not avail themselves of any opportunity to plead guilty and proceeded to trial (PSR ¶¶ 21, 23). The record thus supports a finding that Alvarez was aware of the government's offer. Indeed, he contends that he might have been inclined to accept the offer had his attorney not advised him that he would have been subject to an advisory guideline life term of imprisonment. Counsel's performance in this regard was not deficient: the probation officer correctly recommended that the Court apply a base offense level of 40 to the computation of the base offense level for Alvarez's money laundering convictions. This recommendation is based on the "total offense level" for the specified unlawful activity, that is, the conspiracy to possess with the intent to distribute cocaine and marijuana (PSR ¶¶ 100, 101, 107).

Armed with the correct information regarding the consequences of pleading guilty, Alvarez cannot show that he was denied his right to the effective assistance of counsel as a result of his attorney's alleged failure to secure a plea bargain before the second trial – Alvarez could not have secured a lower sentence than the one imposed. In light of these circumstances, relief on this ground can be summarily denied.

One aspect of Alvarez's allegation warrants an expansion of the record. In his affidavit Alvarez avers that his attorney declined to assist him between trials because he wanted additional compensation to begin work on a second trial. The undersigned has advised Alvarez's attorney, Mr. G. Allen Ramirez, of this allegation and suggested he should file a response to Alvarez's allegation of abandonment before the second trial. Notwithstanding this question of fact, the record fully supports a finding that Alvarez cannot allege and show that any error in his attorney's advice regarding the consequences of a guilty plea without an attendant agreement to cooperate was unreasonable. Accordingly, relief on this ground should be summarily denied.

## E.   **Incorrect advice regarding guideline computation**

Alvarez declares that he would have pleaded guilty had his attorney accurately advised him of guideline sentencing range. As noted above, counsel reasonably determined that Alvarez would have been subject to a life term of imprisonment had he pleaded guilty to the charges without an agreement to cooperate in the prosecution. Section 2S1.1(a)(1) of the United States Sentencing Guidelines provides that the base offense level for a money laundering conviction shall be "the

offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct), and (B) the offense level for the offense can be determined." U.S.S.G. § 2S1.1(a)(1). Here, the probation officer determined the total offense level for Alvarez's drug convictions was 44: a base offense level of 38, 2 levels for the specific offense characteristic of possession of a dangerous weapon during the commission of the offense, and 4 levels based on Alvarez's leadership role in the offense (PSR §§ 100, 101, 104, 106).

The probation officer then determined that the base offense level for the money laundering convictions was 40: the offense level for the specified unlawful activity less any adjustments based on Alvarez's role in the offense as a leader or manager (PSR § 107). This computation is consistent with the Eleventh Circuit's holding in *United States v. Salgado*, 745 F.3d 1109 (11th Cir. 2014). In *Salgado*, the court of appeals held that the district court erred when it included a role enhancement adjustment in its calculation of a defendant's money laundering offense level when that adjustment applied only to the

conduct in the underlying drug conspiracy. *Salgado*, 745 F.3d at 1138-39. The probation officer and Alvarez's attorney correctly computed the applicable guideline sentence. Alvarez cannot show that his attorney misadvised him regarding to the consequences of a guilty plea without an attendant cooperation agreement. Relief on this ground should be summarily denied.

## F.    Failure to object at sentencing

For the reasons stated above, Alvarez cannot show that his attorney's failure to object to the PSR's recommendation was unreasonable. The probation officer correctly applied the sentencing guidelines. Relief on this ground must be summarily denied.

## V.

## AUTHORITIES FOR SUMMARY DISMISSAL AND DENIAL OF RELIEF

### A.    28 U.S.C. § 2255

Pursuant to 28 U.S.C. § 2255, a defendant may move to vacate, set aside or correct his sentence if (1) the sentence was imposed in violation of the Constitution or the laws of the United States; (2) the district court was without jurisdiction to impose the sentence; (3) the sentence imposed was in excess of the maximum authorized by law; or (4) the

sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). The nature of the collateral challenge is extremely limited, being reserved for instances of constitutional or jurisdictional magnitude. *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). If the error is not of constitutional magnitude, the movant must show that the error could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. *United States v. Smith*, 32 F.3d 194, 196 (5th Cir. 1994).

The Rules Governing Section 2555 Proceedings for the United States District Courts (hereinafter "Section 2255 Rules") apply to proceedings brought by a prisoner under 28 U.S.C. § 2255. *See* Section 2255 Rules, R. 1(a). Under Rule 12, "[t]he Federal Rules of Civil Procedure and ... Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a [Section 2255] proceeding." Section 2255 Rules, R. 12.

## B.   Fed. R. Civ. P. 56

The standard applied when ruling on a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure. In pertinent part, Rule 56 provides that the court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (same). Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2510 (1986).

A fact is material if it might affect the outcome of the lawsuit under the governing law. *Anderson*, 477 U.S. 242, 248. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict. If reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted. *Id*. at 249.

The movant on a summary judgment motion bears the initial burden of providing the court with a legal basis for its motion and identifying those portions of the record which demonstrate the absence

of a genuine issue of material fact. The burden then shifts to the resisting party to present affirmative evidence to defeat the motion. *Anderson*, 477 U.S. 242, 257. All facts and inferences drawn from those facts must be viewed in the light favorable to the party resisting the motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 1774 (2007). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

Here, there is no material fact as to the reasonableness of Alavarez's attorney's performance in assessing the benefits of a guilty plea especially with respect to the sentence to which Alvarez would have been exposed.. Here, Alvarez has failed to allege facts apart from his self-serving allegations that show his conviction was based on constitutionally deficient assistance of counsel. Accordingly, the government is entitled to an Order summarily denying relief.

## C.  <u>Expansion of record</u>

Under the Rules following Section 2255 Proceedings, the record may be expanded to include materials that pre-date the filing of the motion for relief under 28 U.S.C. § 2255. Rule 7, Rules following 28

U.S.C. § 2255. The record in the case-at-bar should be expanded to include all of the materials filed in the criminal case, Case No. 7:07-CR-00144.

## D.   Need for an evidentiary hearing

The Fifth Circuit has held that a "district court need not hold an evidentiary hearing to resolve ineffective assistance of counsel claims where the petitioner has failed to allege facts which, if proved, would admit of relief. . . . If on the record before us, 'we can conclude as a matter of law that [the petitioner] cannot establish one or both of the elements necessary to establish his constitutional claim, then an evidentiary hearing is not necessary and we may affirm." *United States v. Fields*, 565 F.3d 290, 298 (5th Cir. 2009) (quoting and citing *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994) and *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995)), *see also*, *United States v. Acklen*, 47 F.3d 739,743-44 (5th Cir. 1995).  The Court has instructed district judges to employ a two-step inquiry:

> First, the district court should examine the record in the case as supplemented by the judge's "personal knowledge or recollection" to determine if the record conclusively negates the facts asserted by the movant. ... Second, the district court should decide whether the movant would be legally entitled to post-conviction relief if his factual allegations are

> true (at least those allegations not conclusively refuted by
> the record or the judge's personal knowledge or recollection.
> ... If the district court resolves these two prongs in favor of
> the movant, "§ 2255 requires it to conduct an evidentiary
> hearing based on those factual allegations which, if found to
> be true, would entitle the petitioner to post-conviction relief."

*United States v. Ochoa*, 127 F.3d 34, 1997 WL 589346 (5th Cir. 1997)(unpublished) (citing *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979)). Here, an evidentiary hearing will not be necessary: the Court can resolve the issues raised by Alvarez's motion on the record before it, including all of the materials filed in the criminal case, Case No. 7:07-CR-00144. The government is entitled to an Order granting it summary judgment and denying Alvarez relief under 28 U.S.C. § 2255.

## E.   <u>Certificate of Appealability</u>

Before Alvarez can perfect an appeal from an order denying him relief under 28 U.S.C. § 2255, he must secure a certificate of appealability. 28 U.S.C. § 2253. "A certificate of appealability may issue pursuant to 28 U.S.C. § 2253(c), 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *United States v. Ratliff*, 719 F.3d 422, 424 (5th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 481 (2000)). Here, reasonable jurists would not

debate the correctness of a holding that Alvarez has failed to make a substantial showing that he was denied his constitutional right to the effective assistance of counsel during the plea negotiation stage and at the sentencing proceeding.

## VI.

## CONCLUSION

In light of the foregoing, the government prays that this Court enter an order summarily denying Alvarez relief under 28 U.S.C. § 2255.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

/s/ James L. Turner
JAMES L. TURNER
Assistant United States Attorney
Texas Bar No. 20316950
Federal ID No. 1406
Attorneys for Respondent
1000 Louisiana Street, Ste 2300
Houston, TX 77002
(713) 567-9102

## CERTIFICATE OF SERVICE

I, James L. Turner, hereby certify that a true and correct copy of the foregoing Response To Mariano Alvarez (Alvarez)'s Motion for Relief under 28 U.S.C. § 2255 has been served on January 25, 2016 via certified mail, return receipt requested, addressed to:

Mr. Mariano Alvarez
94625-179
USP Allenwood
P.O. Box 3000
White Deer, PA 17887

/s/ James L. Turner
JAMES L. TURNER
Assistant United States Attorney